[Cite as *In re A.C.C.*, 2018-Ohio-4719.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF:                          :

     A.C.C.                                   :          CASE NO. CA2018-03-028

                                              :          O P I N I O N
                                                      11/26/2018
                                              :

                                              :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 16-C000228


Dearie, Fischer & Matthew, LLC, James A. Dearie, 12 East Warren Street, Lebanon, Ohio 45036, for appellees

Allen Law Firm, LLC, Mitchell W. Allen, 8469 Mason-Montgomery Road, Suite 2, Mason, Ohio 45040, for appellant


**HENDRICKSON, P.J.**

{¶ 1}  Appellant, T.J.B. ("Father"), appeals a decision of the Warren County Court of Common Pleas, Juvenile Division, granting legal custody of his minor daughter, A.C.C., to appellees, A.H. and T.H., the child's maternal grandparents ("Maternal Grandparents"). For the reasons set forth below, we affirm the juvenile court's decision.

{¶ 2}  S.C. ("Mother") and Father are the unmarried parents of A.C.C., who was born on July 1, 2016. At the time A.C.C. was born, Mother was struggling with an addiction to

heroin and methadone. Father was on house arrest while awaiting trial on charges of violating a protection order and committing domestic violence against Mother. Mother had a son from a prior relationship, and this child was in the custody of his biological father.

{¶ 3} When A.C.C. was born she was diagnosed with medical issues, including micrognathia, a condition in which her jaw did not properly grow. A.C.C. struggled to breathe and was placed on oxygen. She was also unable to eat or drink through her mouth and was fed exclusively through a G-tube.

{¶ 4} After A.C.C. was released from the hospital, she and Mother lived with Maternal Grandparents until November 9, 2016. Mother and A.C.C. then moved into Father's mother's home ("Paternal Grandmother") for a period of time. Mother later moved out of Paternal Grandmother's home and into a boyfriend's home. A.C.C., however, stayed in Paternal Grandmother's care. Father, who had been convicted of two counts of domestic violence and one count of violating a protection order, was incarcerated at the Warren County Community Corrections Center (hereafter, "CCC") during this time.

{¶ 5} Paternal Grandmother moved for custody of A.C.C., and on December 2, 2016, she received emergency custody of A.C.C. upon a finding that Mother had abandoned the child as a result of a heroin addiction. On December 27, 2016, A.H. ("Maternal Grandmother") filed a competing motion for custody of A.C.C. The matters were consolidated, and the court granted temporary custody of A.C.C. to Maternal Grandmother on January 10, 2017.

{¶ 6} Following his release from CCC in January 2017, Father was given two hours of supervised parenting time with A.C.C. every week. Father filed a motion for custody of A.C.C. on May 5, 2017. Paternal Grandmother then withdrew her motion for custody and Maternal Grandmother amended her motion for custody of A.C.C. to include her husband, T.H. ("Maternal Grandfather"). A hearing on Maternal Grandparents' and Father's competing

motions for custody was held before a magistrate on June 2, 2017 and October 17, 2017.

{¶ 7} On June 2, 2017, the magistrate heard testimony from Maternal Grandmother, Maternal Grandfather, Mother, and A.C.C.'s paternal aunt, B.J. Maternal Grandmother testified she and Maternal Grandfather have been married for 18 years, and they live in a home in Lebanon, Ohio with A.C.C. Maternal Grandmother, who is 52 years old, maintains steady employment with a local bank, where she makes approximately $40,000 a year, plus bonuses. Maternal Grandmother testified she and Maternal Grandfather are interested in obtaining legal custody of A.C.C., as neither Mother nor Father are suitable parents.

{¶ 8} Maternal Grandmother expressed her belief that Mother was an unsuitable parent due to her addiction to methadone and heroin. Maternal Grandmother testified Mother used methadone under a doctor's care while pregnant with A.C.C. Maternal Grandmother noted that Mother voluntarily entered treatment at Teen Challenge, a rehabilitation facility in Milford, Ohio, for her addiction problems in February 2017.

{¶ 9} Maternal Grandmother also testified that she did not think Father was a suitable parent due to his criminal history and violent behavior. Maternal Grandmother personally observed injuries Father inflicted on Mother, consisting of cuts on Mother's head, and also observed Father instigate a fight with another person a few years ago.

{¶ 10} Maternal Grandmother believed it was in A.C.C.'s best interest for her and Maternal Grandfather to be named the custodians of A.C.C. She testified that A.C.C. has spent the majority of her life in their care, she has adjusted to their home, and she is doing "very well." Maternal Grandmother discussed A.C.C.'s medical issues, noting that A.C.C. was hospitalized for 47 days after birth, was diagnosed with micrognathia, and has low muscle tone. Maternal Grandmother stated A.C.C. was no longer on oxygen and her sleep apnea issues had subsided. A.C.C. continued to be fed through her G-tube, although small amounts of baby food were being introduced into her diet. A.C.C. could not drink any fluids

due to the possibility that she would choke. However, A.C.C. was undergoing physical therapy to work on her swallowing issues. Help Me Grow also came to Maternal Grandparents' residence to see how A.C.C. was progressing, to offer suggestions to improve A.C.C.'s condition, and to make sure the suggestions were being implemented in A.C.C.'s daily routine.

{¶ 11} Maternal Grandmother stated that she and Maternal Grandfather were well versed on A.C.C.'s medical needs and issues. A.C.C. has a team of six doctors that she sees for her medical issues. A.C.C. sees a speech therapist and a physical therapist on an every-other-week basis at Cincinnati Children's Hospital. A.C.C. also has a NICU specialist, a pulmonary specialist, a doctor for feeding and nutrition, and a regular doctor that she sees on a frequent basis. According to Maternal Grandmother, A.C.C. has weekly doctors' appointments for her various medical needs. Although A.C.C. was 11 months old at the time of the June 2, 2017 hearing, A.C.C. struggled to crawl or stand. Maternal Grandmother testified she and Maternal Grandfather have various home exercises they complete with A.C.C. to help A.C.C. gain muscle strength.

{¶ 12} Maternal Grandmother explained that while A.C.C.'s prognosis with the micrognathia is "day-by-day," A.C.C. is "doing well" and she is a happy baby who loves to play, talk, and dance. Maternal Grandmother testified that she and her husband have taken a "team approach" in caring for A.C.C. Maternal Grandfather cares for A.C.C. during the day, with Maternal Grandmother pitching in during her lunch break and taking over A.C.C.'s care in the evening.

{¶ 13} Maternal Grandmother explained that she supervises Mother's visitations with A.C.C. at Teen Challenge. Maternal Grandmother also supervises Father's visitations with A.C.C. Father's visitations occur at the church where Maternal Grandfather is employed. According to Maternal Grandmother, Father's visitations with A.C.C. are going "fine." Father

- 4 -

is on time for his parenting time and he plays appropriately with A.C.C. during the visits. Father has not had any violent encounters with A.C.C. during the visits. Maternal Grandmother provides Father with weekly updates on A.C.C.'s progress but she does not give Father advance notice of A.C.C.'s doctors' appointments.

{¶ 14} Maternal Grandfather, who is 56 years old, testified he is a pastor at a church in Lebanon and also works as a musician. Maternal Grandfather earns approximately $30,000 a year and, through the flexibility granted by his church, is able to care for A.C.C.'s daily needs while his wife is at work. Maternal Grandfather testified that A.C.C. is progressing "wonderfully" and is "a joy to have around the house." According to Maternal Grandfather, A.C.C. has "at least one, sometimes two, sometimes three" doctors' appointments a week and both he and Maternal Grandmother share in the responsibility of taking A.C.C. to the appointments.

{¶ 15} Mother testified that she is 25 years old and is currently living at Teen Challenge in Milford, Ohio in order to detox from heroin and methadone. Mother entered the facility voluntarily on February 9, 2017. Mother admitted she was not in a position to care for A.C.C. as she was without a job or a home and was "still developing her character." Mother stated she supported Maternal Grandparents' motion for custody and opposed Father's motion for custody as Father is "very angry and it leads to him being violent."

{¶ 16} Prior to A.C.C.'s birth, Mother lived with Father for about three years. Mother testified Father was very controlling and living with him was very chaotic. Mother called the police on Father several times when they were living together because Father often "got physical" with her. According to Mother, Father was verbally and physically abusive towards her on a weekly basis. Mother described instances where Father would take her cell phone and keys to prevent her from leaving the home, which caused Mother to bang on the walls of home so that her neighbors would hear and come to her assistance. On one occasion,

Father picked Mother up by her belt loops, pulled her over a staircase, and threatened to throw her down it. While Mother was pregnant with A.C.C., Father bit her on the arm. He also hit her in the stomach with a door, although Mother could not tell if the incident with the door was accidental or purposeful. When Mother was six months pregnant with A.C.C., Father got upset with Mother for disclosing to another person that Father had bitten her. Father headbutted Mother in the face, causing a gash to Mother's forehead. Neighbors heard the commotion and called the police. As a result of this incident, Father was convicted of felony domestic violence and was sentenced to serve time at CCC.

{¶ 17} Mother was present when Father engaged in physical altercations with others that led to the police being called. On one occasion, Father and Mother were at Father's sister's house when Father locked himself in a room with Mother. Father's brother-in-law was trying to get Mother out of the room and Father got into a fight with his brother-in-law, which prompted Father's sister to call the police. Another time, Father and Mother were at a bar and Mother hugged somebody she knew from high school. Father got angry and "lunged" at Mother. Father's brother-in-law, who was also present at the bar, "stuck up" for Mother and Father and his brother-in-law got into a physical altercation. The police were once again called, and Father was criminally charged for his actions.

{¶ 18} Mother opined that Father is better behaved when he is on probation or is subject to community control. Once Father's probation ends, he starts drinking and becomes violent. A few weeks before the June 2, 2017 hearing, Father began sending Mother angry text messages. In these profanity-ridden text messages, which were admitted as an exhibit at trial, Father referred to Mother in derogatory terms, calling her a "dope fiend," a "fucking stupid ass," a "dirty fucking bitch," a "nigger loving fucking whore," a "stupid fucking cunt," and a "straight fucking piece of shit." The texts also express Father's anger over his lack of visitation with A.C.C., with Father telling Mother, "I've done better without you then I've ever

- 6 -

done with you you guys live a fucking happy life but I'll make damn sure [A.C.C.] has no part of it fuck you [sic]."

{¶ 19} Following Mother's testimony, Father's sister, B.J., testified. B.J. testified that Father lived with her from February 2017 until April 2017. B.J. claimed Father was "completely different" and "more mature" after completing CCC, as his values, mindset, and attitude had all changed for the better. Although B.J. had called the police on Father in November 2013 after her husband and Father got into a physical altercation, she had not observed any "anger issues" with Father since the summer of 2016.

{¶ 20} In addition to living with Father for three months in 2017, B.J. explained that she and Father co-owned a cleaning company. B.J. went with Father on a visit to see A.C.C. in May 2017. B.J. observed that Father and A.C.C. played very well together, A.C.C. appeared happy to be around Father, and Father and A.C.C. had love for one another.

{¶ 21} At the conclusion of B.J.'s testimony, the hearing was continued in progress until October 17, 2017. At this time, Mother and Maternal Grandmother briefly testified as to events that had transpired since the date of the last hearing. Mother stated she completed the Teen Challenge rehabilitation program on September 1, 2017 and moved into Maternal Grandparents home. Although Mother had been sober since February 11, 2017, had her driver's license reinstated, and had obtained full-time employment since completing Teen Challenge, Mother believed it remained in A.C.C.'s best interest for Maternal Grandparents to be given custody of A.C.C.

{¶ 22} Maternal Grandmother updated the court on A.C.C.'s medical issues, informing the court that A.C.C. is doing well but still has some developmental delays which require ongoing physical therapy. Despite being 15 months old, A.C.C. was not crawling. While A.C.C. was now able to eat some baby food by mouth, she could not drink by mouth and continued to take all of her water and most of her food through her G-tube. Maternal

Grandmother testified that anyone who cared for A.C.C. required training on how to properly feed A.C.C. through her G-tube, as dealing with the G-tube could be intimidating and one had to be careful that the G-tube was not inadvertently pulled out.

{¶ 23} Father then testified about his relationship with A.C.C. and his lengthy criminal history, which dated back to when he was a juvenile. Father stated he resided in South Lebanon with his parents and, for the past ten months, has had supervised visitation with A.C.C. one evening a week for two hours at Maternal Grandfather's church. Father testified the visits were going "great" and A.C.C. was always happy to see him. Father stated A.C.C.'s physical health has improved over these ten months and she was no longer on oxygen, was able to eat some baby food, and appeared to be getting stronger.

{¶ 24} Father testified he wanted custody of A.C.C. as he believed he was more than capable of caring for her needs. Father admitted that "[t]here's probably not much [he] hasn't done as far as drinking and drugs," but stated he had been sober since April 11, 2016. Father also recognized he had a history of violent behavior but stated "[e]verybody has a past." Father claimed A.C.C.'s birth changed him and that because of A.C.C., he would "never go back to the way [he] was" in the past.

{¶ 25} Father admitted he first got into legal trouble when he was 12 years old after committing an act of domestic violence against his sister. Then in 2006, after he turned 18 years old, he was convicted of disorderly conduct. The following year, in 2007, Father was convicted of having sex with a child who was at least two years his junior after administering a controlled substance (Clonazepam) to the juvenile-victim. Father explained that he "slept with a girl at a party" when he "had no clue how old she was." Although convicted of administering a controlled substance to the girl, Father denied that he gave her anything, stating, "she was messed up on her own." As a result of his conviction, Father was placed on probation and was ordered to register as a sex offender for ten years. Father's sexual

registration requirement was set to expire on January 8, 2018.

{¶ 26} Father's probation for the sex offense terminated in 2010. In 2011, Father was arrested and charged with resisting arrest and disorderly conduct. He was convicted of resisting arrest and was placed on probation until 2012. In 2013, he was charged with assault and was convicted of the offense in 2014. Later that year, he was again arrested on charges of assault and resisting arrest. The assault charge was dismissed, and he was convicted of resisting arrest in December 2014. Finally, in 2016, following an incident that occurred with Mother when Mother was six months pregnant with A.C.C., Father was arrested on an 11-count indictment that included two charges of felony domestic violence and multiple charges of violating a protection order. Father pled guilty to two counts of domestic violence and one count of violating a protection order, and he was sentenced to CCC. Father was released from CCC on January 4, 2017 and placed on probation until August 14, 2017. Therefore, at the time of the October 17, 2017 hearing, Father had only been without parole supervision for two months.

{¶ 27} With respect to the 2016 domestic violence offense against Mother, Father denied that he hit Mother in the head with a guitar case, but admits he "absolutely" slapped her while she was pregnant with A.C.C. Father explained his actions by stating, "But what – what would anybody do when they find out somebody's going to a methadone clinic seven months' pregnant?" As for his physical assaults of others, Father explained that he got into multiple fights with his brother-in-law and one fight occurred at a bar when Father was "very intoxicated." Father also got into a fight at Burger King and, because 20 people were involved in the altercation, the police were called. Father stated that some guy stole his money and the Vicodin he had been prescribed after his teeth were taken out.

{¶ 28} Father testified that while serving his 2016 sentence for domestic violence, he completed domestic violence classes, vocational classes, alcohol and drug classes,

corrective thinking classes, and anger management classes. Father also voluntarily completed parenting classes. Father testified that at the time of the October 17, 2017 hearing, he operated a heating and cooling business and had a flexible work schedule. Father indicated that if he had custody of A.C.C., she would be left in either his parents' or his sister's care while he worked during the day.[1] Father estimated he earned approximately $3,000 a month from his heating and cooling business.

{¶ 29} On cross-examination, Father was asked about the disparaging text messages he sent to Mother despite having completed his rehabilitation at CCC. Father indicated the text messages had been sent out of frustration as "this whole situation makes [him] crazy." Father felt his messages to Mother were "absolutely" appropriate as Mother and Maternal Grandparents were keeping A.C.C. from him. Father felt the significance of the text messages were being "blow[n] out of proportion."

{¶ 30} Following Father's testimony, the magistrate took the matter under advisement. On October 31, 2017, the magistrate issued a decision denying Father's motion for custody and granting Maternal Grandparents' motion for custody. Father was awarded parenting time with A.C.C. under a "phased-in schedule," in which he was awarded supervised parenting time by Maternal Grandparents every Thursday evening for two hours and supervised parenting time by Paternal Grandmother every other Saturday for three-and-one-half hours until January 31, 2018. Thereafter, Father was given additional parenting time with A.C.C., with Father receiving unsupervised parenting time with A.C.C. starting February 1, 2018. The magistrate's order provided that Father would have parenting time with A.C.C. pursuant to the court's Model I Parenting Schedule as of the time A.C.C. turned three years old.

---

1. Father did not testify about co-owning a cleaning business with his sister. It is unclear from the record the status of Father's ownership or employment with the cleaning business.

{¶ 31} In awarding Maternal Grandparents' custody of A.C.C., the magistrate specifically found "by a preponderance of the evidence that placing [A.C.C.] in the custody of Father would be detrimental to her health and well-being. Father is not a suitable custodian for [A.C.C.] at this time." In making this determination, the court noted that Father failed to appreciate the danger he put A.C.C. in when he assaulted Mother while Mother was pregnant. The magistrate further stated:

> Father violated a protection order that was put into place for Mother and [A.C.C.]. He sent vulgar inappropriate text messages to Mother weeks before the June 2, 2017 trial alleging that she was a fucking whore who he would make sure his daughter never saw. Father attests he was sober during this time. Additionally, he had completed all his parenting and corrective thinking classes.
>
> Father found it necessary at trial to tell Mother to "go fuck herself" since she did not help him get custody of [A.C.C.]. At no time, did he show any understanding that this type of language is unnecessary and aggressive. This shows Father's lack of insight into what type of role model is best for [A.C.C.]. He suggests that everyone has a past and would display jealous and inappropriate behavior like he does given the circumstances at bar. Father attempts to normalize his violent behavior, but the Court views it as detrimental to [A.C.C.'s] safety.
>
> While all of Father's criminal convictions are in the past, they are still representative of his character. Father's violent history of abusive relationships renders him an unsuitable custodian for [A.C.C.]. Father alleges he has not been in trouble since the incident in April of 2016, but he has only been off probation for two months. The past ten consecutive years Father has either been on probation or facing criminal conviction. Such a criminal record creates a chaotic and unstable future for [A.C.C.].
>
> The Court does not trust Father to put [A.C.C.'s] best interest above his own.

{¶ 32} Maternal Grandparents objected to the magistrate's decision, arguing the magistrate erred by awarding Father unsupervised parenting time as of February 1, 2018 and erred by allowing Paternal Grandmother to supervise Father's Saturday parenting time. Father also filed objections to the magistrate's decision, arguing, in relevant part, that the

magistrate failed to make the necessary finding that both Mother and Father were unsuitable parents before awarding Maternal Grandparents custody of A.C.C. He further argued that the evidence submitted at the hearing did not support a finding that he was an unsuitable parent as there was no evidence that an award of custody to him would be detrimental to A.C.C.

{¶ 33} On February 8, 2018, the juvenile court issued a decision in which it overruled in part and sustained in part Maternal Grandparents' objections to the magistrate's decision. The court found it was appropriate for Paternal Grandmother to supervise Father's Saturday visitations, but it eliminated the phased-in unsupervised parenting time schedule set forth by the magistrate. The court ordered that Father would have parenting time supervised by Maternal Grandparents every Thursday evening for two hours and parenting time supervised by Paternal Grandmother every other Saturday for five hours.

{¶ 34} The court also overruled Father's objections to Maternal Grandparents being awarded custody of A.C.C. The court specifically found that "placing [A.C.C.] in the custody of Mother or Father would be detrimental to her health and well-being. Neither Mother nor Father is a suitable custodian for [A.C.C.] at this time." The court found that the evidence presented on June 2, 2017 and October 17, 2017 demonstrated Father "still has a substantial anger issue," his violent behavior was "detrimental to [A.C.C.'s] safety," his "violent history of abusive relationships renders him an unsuitable custodian for [A.C.C.]," and he could not be trusted to put A.C.C.'s interest's above his own. In making these findings, the court noted that although Father believes he has been rehabilitated and is a changed man, "not enough time has passed for the Court to be convinced that Father is rehabilitated from his criminal ways and anger issues."

{¶ 35} Father timely appealed the juvenile court's decision, raising the following assignment of error:

{¶ 36}  THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING CUSTODY TO NON-PARENTS WHEN THE RECORD DOES NOT SUPPORT A FINDING THAT CUSTODY TO FATHER WOULD BE DETRIMENTAL TO THE CHILD, AND THUS THAT FATHER WOULD BE AN UNSUITABLE PARENT.

{¶ 37}  In his sole assignment of error, Father argues the juvenile court erred by granting legal custody of A.C.C. to Maternal Grandparents as the record does not support a finding that he is an unsuitable parent or that an award of custody to him would be detrimental to A.C.C.  Father argues the court improperly engaged in a best interest analysis, rather than an unsuitability analysis, and further contends there was no evidence introduced that any of his past criminal actions or wrongdoings has had a detrimental effect on A.C.C.

{¶ 38}  "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Hockstok v. Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982) and *In re Murray*, 52 Ohio St.3d 155, 157 (1990).  "This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution."  *Id.*, citing *Santosky* at 753 and *In re Shaeffer Children*, 85 Ohio App.3d 683, 689-690 (3d Dist.1993).  Therefore, in a child custody proceeding brought under R.C. 2151.23(A)(2) between a parent and nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child."  *In re Perales*, 52 Ohio St.2d 89 (1977), syllabus.  "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may

- 13 -

infringe upon the fundamental parental liberty interest of child custody." *Hockstok* at ¶ 17.

{¶ 39} If a court makes an unsuitability determination on the basis that parental custody would be detrimental to the child, the court "must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent." *In re Dunn*, 79 Ohio App.3d 268, 271 (3d Dist.1992), citing *In re Perales* at 98. "However, in the context of a parent's suitability, it is impossible to consider whether placing custody with a parent would be detrimental without considering the specific child in question and how giving custody to the parent would affect that child's welfare." *In re J.M.*, 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 25. In looking at whether parental custody would be detrimental to a child, it has become "increasingly common for courts to weigh the emotional and psychological (as well as the physical and mental) effects which a custody award may have on the child." *In re Perales* at 98, fn. 11.

{¶ 40} A juvenile court has broad discretion in determining custody matters, and its decision will not be disturbed on appeal absent an abuse of discretion. *In re J.M.* at ¶ 17. An abuse of discretion is more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court." *Valentine v. Valentine*, 12th Dist. Butler No. CA2004-01-024, 2005-Ohio-2366, ¶ 42, citing *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 41} Contrary to Father's assertions, the juvenile court engaged in the correct analysis before awarding legal custody of A.C.C. to Maternal Grandparents. The court

specifically found that an award of custody to either Mother or Father "would be detrimental to [A.C.C.'s] health and well being" and that both parents were, therefore, unsuitable. After a thorough review of the record, we find that the evidence submitted at the June 2, 2017 and October 17, 2017 hearings supported the juvenile court's finding of unsuitability. The record supports the juvenile court's determination that placing A.C.C. in Father's custody would, at this time, be harmful and detrimental to her well-being due to Father's anger issues and his difficulty in controlling his violent nature.[2]

{¶ 42} Although Father contends that there is no evidence that his history of abusive relationships or his prior criminal history is "known to [A.C.C.] or that they had any effect on her at all," the record demonstrates otherwise. Father has history of abusive relationships that dates back to his childhood. Father's most recent act of domestic violence against Mother occurred *while Mother was pregnant with A.C.C.* Father's violent behavior directly threatened the health and safety of A.C.C. while she was in the womb.

{¶ 43} Father contends that he is a "changed man" since A.C.C.'s birth and that he was rehabilitated while serving his sentence for domestic violence. Father points to the fact that he has not used drugs or alcohol since April 2016, he completed various classes on corrective thinking, anger management, domestic violence, and alcohol and drug usage while at CCC, and he successfully completed his probation for domestic violence as evidence of his changed nature. Although Father's accomplishments are commendable, the fact remains that only two months passed between the date his probation terminated and the court

---

2. Father argues that the court did not have "discretion to terminate a parent's right to custody" as the finding of unsuitability was not supported by the record. However, the juvenile court did not terminate Father's parental rights when it awarded legal custody of A.C.C. to Maternal Grandparents. "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact." *In re Fulton*, 12th Dist. Butler No. CA2002-09-236, 2003-Ohio-5984, ¶ 7, citing R.C. 2151.011(B)(21). Unlike permanent custody, granting legal custody does not terminate the parent-child relationship. *Id.* Father has retained residual parental rights and responsibilities towards A.C.C., including contact and visitation, and he has the ability to obtain custody of A.C.C. at a future date should he no longer be adjudged an unsuitable custodian.

concluded the hearing on Maternal Grandparents' and Father's custody motions. As Mother testified at trial, and as Father's history of arrests and convictions demonstrated, Father has a history of violence and criminal behavior once his time on community control or probation ends. The record supports the court's determination that "not enough time has passed for the Court to be convinced that Father is rehabilitated from his criminal ways and anger issues." This is especially true as, despite having completed courses for anger management and corrective thinking, Father sent angry, hate-filled messages to Mother in the weeks before the custody motions were heard. In addition to calling Mother a variety of profane names, Father stated he would "make damn sure [A.C.C.] has no part" of the "fucking happy life" Mother and Maternal Grandparents led. The juvenile court put "great weight in those text messages as evidence of Father's continued anger/range issues" and we agree that such messages demonstrate Father's inability to appropriately control his anger. Given A.C.C.'s tender age and her current physical limitations, Father's substantial anger issues continue to pose a threat to A.C.C.'s well-being.

{¶ 44} Accordingly, having thoroughly reviewed the record before us, we find that the juvenile court did not abuse its discretion when it denied Father's motion for custody and granted Maternal Grandparents' motion for custody of A.C.C. The preponderance of the evidence demonstrates that an award of custody to Father would be detrimental to A.C.C.'s well-being. Father's sole assignment of error is, therefore, overruled.

{¶ 45} Judgment affirmed.

RINGLAND and PIPER, JJ. concur.