[Cite as *In re Z.M.*, 2021-Ohio-3744.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [Z.M., | : | No. 20AP-295 |
| | | (C.P.C. No. 12JU-7975) |
| M.M., | : | |
| | | (ACCELERATED CALENDAR) |
| Appellant]. | : | |
| | : | |

---

D E C I S I O N

Rendered on October 21, 2021

---

**On brief:** *Campbell Law, LLC,* and *April Campbell*, for appellant.

**On brief:** *Simakovsky Law*, and *Mariam El-Shamaa*, for appellee Maternal Great-Grandmother. **Argued:** *Mariam El-Shamaa.*

**On brief:** *Richard J. Neal Law, LLC*, and *Richard J. Neal*, for appellee Mother. **Argued:** *Richard J. Neal.*

**On brief:** *CASA of Franklin County*, and *Nicole Thornton*, for Guardian ad Litem.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BROGAN, J.

{¶ 1} This appeal arises out of two nonparents' pursuit of legal custody of a minor child, Z.M. The Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, rejected a magistrate's determination that custody of Z.M. should be awarded to M.M. ("appellant"), a former friend of the family who served as Z.M.'s caretaker

for approximately three years and, instead, awarded custody of Z.M. to her maternal great-grandmother, L.M. ("appellee"). The facts pertinent to appellant's challenge to the trial court judgment are as follows.

{¶ 2} Z.M. was born in 2010 to B.G. ("mother"). The alleged father was determined at the conclusion of the custody proceedings to not be biologically related to Z.M., and her true biological father remains unknown.

{¶ 3} In 2012, Franklin County Children Services ("FCCS") received a referral regarding the well-being of Z.M. and her younger brother. FCCS filed a complaint alleging Z.M. to be a neglected and dependent child under R.C. 2151.03(A)(2) and 2151.04(C), and Z.M. was removed from her mother's care and placed with appellee. The trial court then found Z.M. to be a neglected and dependent minor and awarded legal custody of Z.M. to her maternal grandmother (appellee's daughter) ("grandmother"). Although her grandmother had legal custody of Z.M., the parties do not dispute that Z.M. physically remained in appellee's care. Appellee gained legal custody of the younger brother in 2013.

{¶ 4} Appellee served as Z.M.'s caretaker for approximately three years. In 2015, grandmother and mother pressured appellee to return Z.M., and appellee eventually surrendered Z.M. to mother. After Z.M. re-entered her mother's care, FCCS again became involved with the family due to truancy issues. In early 2016, the trial court terminated grandmother's legal custody of Z.M and granted FCCS temporary court custody. In April 2016, Z.M. was placed in the care of appellant, who, at that time, was friends with mother. A case plan was filed for mother with the goal of reunification with Z.M.

{¶ 5} In September 2016, both appellant and appellee filed motions for legal custody of Z.M. In April 2017, a magistrate ordered weekly supervised visitation for appellee with Z.M. A hearing on the competing legal custody motions was held over several days spanning September 2018 to June 2019.

{¶ 6} At the hearings, appellant explained that while she is not related to Z.M. biologically, mother had asked her to be Z.M.'s godmother when Z.M. was born. She testified that following mother's inability to care for Z.M. in 2016, appellant went through the process to become a "[k]inship" placement for Z.M. (Apr. 2, 2019 Tr. at 20, 33.) At the time of the hearing, Z.M. had lived with appellant for over three years in her Columbus area home along with appellant's roommate and his young daughter. Appellant believes that in

her care Z.M. is safe and secure. She explained, in reference to 27 9-1-1 calls from her home between March 2016 and August 2018, those calls did not involve actual harm to herself or Z.M. but, instead, involved her reporting gunshots, attempted break-ins, a few accidents, and some false alarms.

{¶ 7} Appellant testified to Z.M. doing very well academically and being involved in activities such as gymnastics. Appellant stated she takes Z.M. to court-ordered visitations and medical appointments, including counseling for mental health issues. Appellant receives help from her own mother and her roommate. According to appellant, she enjoys a strong relationship with Z.M., and Z.M. thinks of her roommate's daughter as a little sister. Appellant testified that Z.M. expressed a desire to live with mother and had also at one point requested that another sibling, her youngest brother who was in foster care at the time, come live with appellant. Appellant testified she did not have any current relationship with Z.M.'s mother, grandmother, or great-grandmother (appellee), but testified she does set up visits between Z.M. and Z.M.'s youngest brother through the foster mom. Appellant testified that should she get custody, she would make sure Z.M. was available to visit with Z.M.'s family members that show appropriate behaviors.

{¶ 8} On cross-examination, appellant described a falling out with mother arising from appellant not allowing mother to take Z.M. to a baby shower. Appellant also testified that she is currently disabled and receives income from social security, state agency money for caring for Z.M., and food stamps. Appellant testified to personally being diagnosed with post-traumatic stress disorder, depression, and bi-polar disorder and stated she appropriately maintains treatment for those conditions and has not relapsed. Appellant testified she has no concerns about appellee aside from "[Z.M.] seem[ing] to think that [appellee] is harsh with her," but admitted that Z.M. had expressed a desire to live with appellee so she could see her brother and, in one incident, started packing her bags to go live with appellee. (Apr. 2, 2019 Tr. at 44-45.)

{¶ 9} The most recent "lay guardian ad litem" who was assigned to the case in February 2019 testified to supporting appellant's motion for legal custody. (Mar. 20, 2019 Tr. at 3.) She testified to personally speaking to Z.M., appellee, appellant, appellant's mother, appellant's roommate and his daughter, Z.M.'s teacher, and Z.M.'s counselor at Nationwide Children's Hospital. The guardian ad litem testified to believing that family is

an "important" factor to consider in Z.M.'s custody determination, but to her "family is broader than blood" and Z.M. has a "long-time bond" with appellant, appellant's mother, who she views as a "grandmother," and the roommate's daughter who the guardian ad litem called Z.M.'s "sister." (Mar. 20, 2019 Tr. at 113.) The guardian ad litem's recommendation to award legal custody to appellant was based both on her belief that Z.M. is doing well and has long-term stability in appellant's care, and the guardian ad litem's observations of appellee's visitations with Z.M.

{¶ 10} Regarding appellant's care, the guardian ad litem testified Z.M. is generally well adjusted and very comfortable in appellant's home and has a sisterly relationship with appellant's roommate's daughter. The guardian ad litem testified Z.M. is bright but has trauma-related issues and emotional and behavioral issues that the guardian ad litem believed stemmed from the instability and stress of her family life and her inability to consistently see her parents and siblings. The guardian ad litem testified that in appellant's care, Z.M. is receiving treatment for her mental health issues.

{¶ 11} As to appellee, the guardian ad litem did not express concerns about appellee's home or her ability to provide for Z.M.'s basic needs. She testified appellee's home in Dayton appeared to be safe and in working order, with sufficient food, and Z.M. would have her own room.

{¶ 12} Instead, the guardian ad litem's concerns with appellee stemmed from her observations of appellee's visitations with Z.M. The guardian ad litem believed appellee "corrected * * * pretty much everything [Z.M. and her siblings] did." (Mar. 20, 2019 Tr. at 99.) As examples, the guardian ad litem stated appellee would tell the children to put toys away frequently during the visit, would take a phone away from the children to confirm the songs they chose were appropriate, prohibited the youngest child from walking around while he had food, told the children to be quiet, and told the seven year old to not use the word "never." (Mar. 20, 2019 Tr. at 99-100, 134-35.) The guardian ad litem perceived these actions as "overly controlling" and inconsistent with the developmental needs of the children considering their ages (9, 7, and 2 years old). (Mar. 20, 2019 Tr. at 100.)

{¶ 13} She also observed, near the end of a happy visit, appellee whisper to the children and say, "but I still love you," after which the children got very upset and did not want to separate. (Mar. 20, 2019 Tr. at 101.) The guardian ad litem testified that, instead

of consoling Z.M., appellee recorded video of them, and Z.M. sought appellant for comfort for approximately 40 minutes after the visit ended. The following visit, appellee told Z.M. she would not bring the sibling back to any more visits. Appellee likewise told the guardian ad litem she would not bring the sibling to the visits anymore because the children got so upset when they had to leave each other and the trauma of leaving each other affected the sibling at home. Although the guardian ad litem thought "it would be fantastic and in [Z.M.'s] best interest to visit with [the brother in appellee's custody]," she did not think visits with appellee should continue because appellee has not consistently brought Z.M.'s brother with her. (Mar. 20, 2019 Tr. at 107.) The guardian ad litem supported the motion filed by FCCS to suspend Z.M.'s visitations with appellee.

{¶ 14} The guardian ad litem testified she spoke with Z.M. about her wishes multiple times, and Z.M. expressed a desire to live with her mother, and if that was not possible, her father. If those two options were unavailable, Z.M. "initially" told the guardian ad litem she wanted to live with appellee, and when asked to explain why, she said she wanted to see her brother. (Mar. 20, 2019 Tr. at 110.) According to the guardian ad litem, when presented with the scenario of having arranged visits with her brother, Z.M. stated she would like to stay in appellant's home. The guardian ad litem believed appellant would cooperate in facilitating a relationship between Z.M. and her siblings. Conversely, the guardian ad litem believed that if appellee received custody, appellee would not have further contact with appellant. The guardian ad litem testified that "there's no question [Z.M.] wants contact with her [siblings]," but she believed Z.M.'s bond with appellant is stronger than what she observed between Z.M. and her siblings. (Mar. 20, 2019 Tr. at 125.)

{¶ 15} On cross-examination, the guardian ad litem admitted that during visits appellee kept the room clean and in control despite three small children playing together, appellee did not participate in drama caused by mother and father unexpectedly showing up at one visitation, the sibling relationship should be an important factor to consider, and there were no concerns about safety or basic needs being met in appellee's home.

{¶ 16} An FCCS caseworker assigned to the case in July 2017 testified that she agreed with appellant's motion for legal custody. She believed all Z.M.'s needs were met at appellant's home and that continued placement there would be in Z.M.'s best interest. The caseworker's supervisor from FCCS testified she agreed appellant should be granted legal

permanent custody of Z.M.   The supervisor explained she has not personally observed Z.M. with appellant or appellee, but understood from the reports filed in the case that appellant had been cooperative with FCCS, provided a stable home for Z.M., and shared a bond with Z.M. while, conversely, there was an issue with appellee being controlling and not consoling Z.M., and with mother showing up to a visit.   According to the supervisor, FCCS had no concerns about the environment appellant provided for Z.M.

{¶ 17}  On cross-examination, the supervisor admitted that Z.M.'s behavioral issues while in appellant's care included violent tantrums, stealing, lying, and self-harm. The supervisor was not alarmed that 27 calls to 9-1-1 came from appellant's home from 2016 to 2018.   She denied telling appellee she would never be granted custody or telling caseworkers to not support appellee's bid to get custody, but did testify that she told appellee and caseworkers that Z.M. is placed in the "least restrictive setting" in appellant's care and "[w]e would not move her" when there is no issue with the placement. (Mar. 20, 2019 Tr. at 50.) The supervisor agreed that FCCS conducted two prior home studies with appellee and that appellee was approved, but the agency did not contemplate visitation for appellee at that time because "[FCCS] w[as] not looking to reunify with [appellee]." (Mar. 20, 2019 Tr. at 54.)  She admitted Z.M. has a strong family bond, but that FCCS filed a motion to stop visitation with appellee despite her having custody of Z.M.'s brother.

{¶ 18}  Appellee testified she was Z.M.'s caretaker from summer 2012 to summer 2015, during which time there were no problems or issues.  She gained legal custody of one of Z.M.'s younger brothers in 2013, so those siblings were able to spend a few years together in her home.  She testified she gave Z.M. back to mother after mother told her she would be charged with kidnapping.  According to appellee, when FCCS again removed Z.M. from mother's care in the beginning of 2016, FCCS asked appellee if she could take her a second time.  Appellee testified that although she wanted to take Z.M. again, she could not take custody at that time because she was in the process of moving to Dayton and, in her experience, getting home studies and other approvals completed in order to gain custody would take some time and in part depend on getting established in her new home.

{¶ 19}  Appellee testified she ultimately filed for legal custody of Z.M. in September 2016.  According to appellee, she would call FCCS frequently to inquire about custody. By December 2016, the FCCS caseworker's supervisor informed appellee that FCCS was not

looking at placing Z.M. with her. Eventually, appellee was granted visitation by court order, and appellee commuted to Columbus by Greyhound bus with Z.M.'s brother to attend the visits. FCCS did not provide her gas money, bus tickets, or other support. She stated the visits went generally well, but there was tension because Z.M. wanted to talk to her about some things but could not do so because she had to return to appellant's home. For example, in regard to whispering, appellee testified that Z.M. asked to go home with her, but appellee told her she could not talk about that topic. Appellee agreed that she corrected the children at the visitations but stated she did so for the safety of the children and to discourage improper behavior, such as sticking their tongues out. Appellee testified that at the end of the visits Z.M. and her brother would "scream leaving each other because they want to be together. They love each other" and that the sadness did not end with the visitation. (Apr. 2, 2019 Tr. at 72.) The brother in appellee's custody would be sick for days from crying so much. She decided to stop bringing Z.M.'s brother to the visitations because she knew it was hurting the children and it was "heartbreaking." (Apr. 2, 2019 Tr. at 77, 96.) Appellee testified she would follow court orders regarding visitations but otherwise did not want Z.M. to be around appellant who appellee described as mother's former friend and babysitter.

{¶ 20} On cross-examination, appellee explained there were five living generations of her family and at the beginning of the case a number of relatives were willing to take custody of Z.M. The family had a meeting and decided she, as a family elder, would be in the best position to devote time to the children and teach her family traditions. Appellee admitted she did not have a driver's license, is not currently employed, and is under temporary disability. Appellee confirmed that the brother she has custody of attends school and doctor's appointments. Appellee testified she was also seeking custody of Z.M.'s other younger brother—the one previously in foster care.

{¶ 21} The alleged father appeared at the hearing on April 2, 2019 and was sworn in. Although he expressed his intent "to get * * * custody back to [Z.M.'s] great grandma," this statement was made in the context of a conversation about whether father needed an attorney. (Apr. 2, 2019 Tr. at 111.) His testimony as to his wishes was cut short due to the attorney issue, and the magistrate suggested he come back for the June hearing. Following DNA evidence ruling him out as father, he did not testify at that hearing. Mother apparently

attempted to testify at the hearing on April 2, 2019 but was arrested on outstanding warrants and was unable to do so.

{¶ 22} At the conclusion of the hearing, the magistrate issued an oral decision granting custody to appellant. In doing so, the magistrate cited evidence that Z.M. had been placed with appellant for three years, the home was appropriate and meeting her needs, and she had a strong bond to appellant. Conversely, the magistrate thought appellee was reluctant to comply with FCCS and the guardian ad litem, had concerns about appellee's demeanor and failure to look directly at others in the courtroom, and believed Z.M. did not have "the closest of bonds" with appellee. (June 24, 2019 Tr. at 22.) The magistrate also thought that placement with appellee would turn Z.M.'s life "upside-down" and disconnect her with appellant. (June 24, 2019 Tr. at 22.) The magistrate issued a decision and judgment entry on July 9, 2019 summarily terminating the temporary court custody to FCCS, awarding legal custody to appellant pursuant to R.C. 2151.353(A)(3), and terminating appellee as a party to the action.

{¶ 23} Appellee filed objections to the magistrate's decision pursuant to Civ.R. 53. The objections included the contention that the magistrate's decision was against the manifest weight of the evidence, and the magistrate erred in both declining to conduct an in camera interview of Z.M. and in not issuing requested findings of fact and conclusions of law. Mother filed a memorandum in support of appellee's objections, asking the trial court to grant legal custody to appellee instead of appellant.

{¶ 24} On May 21, 2020, the trial court sustained appellee's objections. The trial judge held an in camera interview with Z.M. and determined Z.M. is incapable of making a sound decision as to where she would like to live. The trial court noted that since the filing of the magistrate's decision, appellee had also been granted custody of Z.M.'s other younger brother. The trial court found that Z.M.'s mother requested her desire through counsel that her daughter be placed with appellee to keep the family together. The court noted that Z.M. recently had a significant opportunity to bond with her brothers because appellee now had custody of both her brothers. The court noted appellee has been steadfast in her pursuit of custody of Z.M. because she cared for her previously for three years. The court acknowledged that Z.M. has also bonded with appellant in April 2016 to the date of the decision. The court also found that appellant was not attempting to foster a familial

relationship with Z.M.'s mother and appellee. The court addressed Z.M.'s wishes as expressed by her guardian ad litem with due regard to Z.M.'s maturity. The court noted the following:

> [Z.M.]'s lay guardian *ad Litem*, Stefanie Coe, has expressed [Z.M.]'s wishes through testimony. The Court has additionally reviewed the Guardian's report filed with the Court on March 13, 2019. There are times where [Z.M.] has indicated she wants to be with her mother, [B.G.], then her prior alleged father, [T.T.], and then would choose to be with Great Grandmother as a last resort. It is important to note that [Z.M.] has been suffering from various mental ailments and is currently on multiple prescribed medications, like Intuniv and Prozac, and engaged in therapy. The child has had suicidal ideations in the care of [M.M.].

(May 21, 2020 Decision and Entry on Objs. at 10.)

{¶ 25} The trial court ultimately found that a legally secure placement in the same home as her siblings was in Z.M.'s best interest. The trial court (among other orders) granted FCCS's motion to terminate temporary custody and appellee's motion for legal custody of Z.M. and denied appellant's motion for legal custody.

{¶ 26} Appellant filed a timely appeal and assigns the following four assignment of error for our review:

> [I.] The juvenile court's [decision] should be reversed, because the court used the incorrect standard of review in making its decision.
>
> [II.] The juvenile court abused its discretion in sustaining [appellee]'s objections, and in granting [appellee] legal custody of Z.M. The evidence weighed manifestly against granting [appellee] legal custody of Z.M.
>
> [III.] The juvenile court erred in determining that the magistrate was required to file written findings of facts and conclusions of law.
>
> [IV.] The juvenile court used the wrong standard in determining whether an in camera interview with Z.M. was required, and erred in finding that it was.

{¶ 27} This court agrees the trial court used the wrong standard in reviewing the findings and recommendations of the magistrate. *See* May 21, 2020 Decision and Entry on

Objections at 1-2, 4-6 (employing manifest weight of the evidence standard in determining best interest of the child factors despite citing to independent review standard earlier in the decision). The correct standard is provided in Juv.R. 40(D)(4)(d) which provides that a juvenile court "shall undertake an independent review" regarding objections to determine whether the magistrate properly applied the law and properly determined factual issues. *See also* Civ.R. 53(D)(4)(d) (stating independent review standard on objections to a magistrate decision). The manifest weight and abuse of discretion standard is in fact more deferential to the magistrate's decision than the independent review standard. Thus, we fail to see how appellant was harmed by the stricter standard of review used by the trial court.

{¶ 28} The first assignment of error is overruled.

{¶ 29} In her second assignment of error, appellant contends the trial court abused its discretion in awarding custody of Z.M. to appellee.

{¶ 30} "Pursuant to R.C. 2151.353(A)(3), if a child is adjudication an abused, neglected, or dependent child, the juvenile court may award legal custody of the child 'to either parent or to any person who, prior to the dispositional hearing, files a motion requesting legal custody of the child.' " *In re A.B.*, 12th Dist. No. CA2016-11-021, 2017-Ohio-5776, ¶ 10. Legal custody may be awarded to a nonparent " 'upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest.' " *In re C.A.*, 12th Dist. No. CA2014-07-165, 2015-Ohio-1410, ¶ 13, quoting *In re L.A.B.,* 12th Dist. No. CA2012-03-008, 2012-Ohio-5010, ¶ 12.

{¶ 31} To determine the best interest of a child under R.C. 2151.353(A)(3), the juvenile court is required to consider all relevant factors. *In re A.L.H.*, 12th Dist. No. CA2010-02-004, 2010-Ohio-5425, ¶ 9, *appeal denied*, 128 Ohio St.3d 1427, 2011-Ohio-1049. R.C. 2151.353(A)(3) does not specify the factors a trial court must consider in making a legal custody determination. However, appellate courts have found the factors stated in R.C. 3109.04(F) to be instructive in determining the best interests of the child in an R.C. 2151.353(A)(3) legal custody case, even where nonparents are involved. *See In re I.M.*, 10th Dist. No. 13AP-468, 2013-Ohio-5549, ¶ 11-12 (finding the trial court did not abuse its discretion in applying R.C. 3109.04(F) criteria in making its best interests of the child determination under R.C. 2151.353(A)(3)); *In re C.W.*, 2d Dist. No. 28781, 2020-Ohio-

6849, ¶ 6 (determining best interests of the child in an R.C. 2151.353(A)(3) case using R.C. 3109.04(F)(1) factors); *A.L.H.* at ¶ 9 (considering R.C. 3109.04(F)(1) factors in making best interests of the child determination under R.C. 2151.353(A)(3)). *See also In re G.M.*, 8th Dist. No. 95410, 2011-Ohio-4090, ¶ 14-16 (noting that, while some appellate districts apply the best interest factors in R.C. 3109.04(F) and other appellate districts apply the best interest factors set forth in R.C. 2151.414(D), the particular statute referenced is "of no great consequence" because R.C. 2151.353(A)(3) does not mandate review of specific factors and the trial court may consider any factor it deems appropriate and instructive in a given case).

{¶ 32} The R.C. 3109.04(F)(1) factors relevant to a legal custody determination involving a nonparent under R.C. 2151.353(A)(3) include: (1) the wishes of the child's parents regarding the child's care; (2) the wishes and concerns of the child, as expressed to the juvenile court; (3) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (4) the child's adjustment to the child's home, school, and community; and (5) the mental and physical health of all persons involved. *C.W.* at ¶ 6.

{¶ 33} When reviewing custody issues, a juvenile court's decision is granted great deference and will not be disturbed on appeal absent an abuse of discretion. *In re A.C.C.*, 12th Dist. No. CA2018-03-028, 2018-Ohio-4719, ¶ 40. An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Id.* When applying an abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *Id.* The discretion afforded to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 34} For manifest weight of the evidence challenges, appellate courts weigh the evidence, and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the juvenile court clearly lost its way, such that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 35} Appellant argues the statutory factors strongly support the magistrate's recommendation to award her custody of Z.M. She argues she has had an established

relationship with Z.M. that well surpasses that of appellee. She notes the guardian ad litem testified that she thought Z.M.'s bond with appellant was stronger than with her brothers. The guardian ad litem testified:

> I would say [Z.M.]'s bond with [appellant] is stronger what I observed during visits with the children, I mean, they clearly interacted and enjoyed their time with each other. But you know, in moments of crisis, moments of upset, moments of extreme stress [Z.M.] was clearly focused on [appellant].

(Mar. 20, 2019 Tr. at 125.) Appellant argues the overwhelming evidence showed she was a caring foster parent to Z.M., she met the child's needs, and she was the only adult with whom Z.M. had an established bond.

{¶ 36} In contrast, appellant argues the only evidence was that Z.M.'s relationship with appellee was "fraught with emotional distress." (Appellant's Brief at 21, citing Mar. 20, 2019 Tr. at 87-128.) Appellant argues the record does not support the trial court's finding that Z.M. "cultivated relationships" with family while in appellee's custody. (Appellant's Brief at 22, citing May 21, 2020 Decision and Entry on Objs. at 10.)

{¶ 37} The guardian ad litem raises many of the same arguments made by appellant. The guardian ad litem notes that mother did not participate in the trial and did not testify, and mother provided FCCS with appellant's name and indicated appellant was Z.M.'s godmother. The guardian ad litem further indicates the trial court analyzed the wishes of the alleged father, who was later determined to not be biologically related to Z.M. and did not testify at trial. According to the guardian ad litem, absent custody with her mother or alleged father, Z.M. wished to be placed with appellant with visitation with her brothers. The guardian ad litem argues that every witness testified that Z.M. had a strong bond with her brothers, but that she also has a strong bond with appellant, appellant's mother, and another child in appellant's home. The guardian ad litem did not observe a bond between Z.M. and appellee. The guardian ad litem argues the record contains evidence of Z.M.'s adjustment to appellant's home, while no such evidence exists for appellee's current home. The guardian ad litem states that appellant testified she would facilitate contact between Z.M. and her biological family members, while appellee testified she would not allow Z.M. to see appellant. According to the guardian ad litem, appellant made Z.M. available for visits, but appellee attended visits sporadically and refused to bring the brother to visit with

Z.M. The guardian ad litem acknowledges there is no evidence of any concerns about the mental or medical health of either party, no one in either household has been found responsible for child abuse or neglect, and neither party plans to move.

{¶ 38} Both appellant and the guardian ad litem concede that the juvenile court enjoys broad discretion in child custody proceedings. They argue the standard of review is whether the juvenile court abused that discretion.

{¶ 39} There is no evidence in this record that suggests the trial court abused its discretion or lost its way in awarding custody of Z.M. to appellee. Z.M.'s mother requested that Z.M. be placed in the custody of appellee. Z.M. was too young and immature to make an intelligent choice of who should be her custodian. The child adjusted well in the custody of appellee when she was younger. It is clear Z.M. wants to live with her two younger siblings who are in the custody of appellee. There is no indication appellee would frustrate visitation by Z.M.'s mother or any other person who may significantly affect Z.M.'s best interest.

{¶ 40} The second assignment of error is overruled.

{¶ 41} In her third assignment of error, appellant argues the trial court erred in determining that the magistrate was required to file written findings of fact and conclusions of law. Generally speaking, Juv.R. 40 and Civ.R. 53 do not require the magistrate make written findings of fact and conclusions of law. *See* Juv.R. 40(D)(3)(a) and Civ.R. 53(D)(3)(a)(ii) ("Subject to the terms of the relevant reference, a magistrate's decision may be general unless findings of fact and conclusions of law are timely requested by a party or otherwise required by law."). In this matter, appellant agrees the magistrate explained in detail his factual findings and his legal reasoning and fails to explain how the asserted error is prejudicial to her case.

{¶ 42} The third assignment of error likewise is overruled.

{¶ 43} In her fourth assignment of error, appellant contends the trial court used the wrong standard in determining whether an in camera interview with Z.M. was required. Appellant notes the trial court relied on R.C. 3109.04(B)(1) to determine that an in camera interview was required. Appellant argues that statute section applies only to the allocation of custody between parents. Appellant argues that for custody disputes between nonparents the appropriate statute is R.C. 2151.23(A)(2) and that statute does not address

whether the court can conduct an in camera interview of the child with regard to a suitability determination. (Appellant's Brief at 29, citing *In re D.C.J.*, 8th Dist. No. 97681, 2012-Ohio-4154, ¶ 55-56.)   In any event, there was no prejudice in the trial court's determining for itself whether Z.M. could make an intelligent choice of whom she wished to live with.

{¶ 44}  The fourth assignment of error is overruled.

{¶ 45}  The judgment of the trial court will be affirmed.

*Judgment affirmed.*


BROWN and LUPER SCHUSTER, JJ., concur.


BROGAN, J., retired, of the Second Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).


_____