[Cite as *In re P.L.*, 2025-Ohio-5693.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | CASE NO. CA2024-09-025 |
| P.L. | : | OPINION AND |
| | | JUDGMENT ENTRY |
| | : | 12/22/2025 |
| | : | |

CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION[1]
Case No. AD20210175

Durst Kerridge LLC, and Paul R. Kerridge, Alexander J. Durst, and Maddie J. Wilhoite, for appellee.

Dougherty, Hanneman & Piccin, LLC, and Douglas B. Dougherty, for appellant.

## __O P I N I O N__

**BYRNE, P.J.**

{¶ 1}  Mother, the biological mother of "Paige,"[2] appeals from the decision of the

---

1. We have recaptioned this case as "In re P.L." The caption used in the juvenile proceedings identified the parents of the child at issue in this appeal.

2. "Paige" is a pseudonym that we use for purposes of protecting the minor child's privacy and for improving the readability of this opinion. *Chasteen v. Lynch*, 2024-Ohio-5857, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024). For the same reasons, we use pseudonyms for

Fayette County Court of Common Pleas, Juvenile Division, which modified an existing custody order and transferred legal custody of Paige from Mother to Paige's biological father ("Father") and named Father residential parent. For the reasons that follow, we reverse the custody decision.

## I. Factual and Procedural Background

{¶ 2} Mother and Father were never married. Paige was born to the parties in 2018. The parties also share an older child—"Nathan"—who is now an adult.

{¶ 3} Mother, Father, and Paige lived together in Ohio for approximately three years after Paige was born. In or around April 2021, Paige was staying with maternal relatives in Russell Springs, Kentucky. Mother and Nathan then left Ohio and joined Paige in Kentucky, where they remained.

{¶ 4} Also in April 2021, and after Mother and the children left Ohio, Father filed a complaint in the Fayette County Juvenile Court to establish parentage over Paige and to allocate parental rights and responsibilities.

{¶ 5} After moving to Kentucky, Mother petitioned the district court of Russell County, Kentucky for a protection order against Father. On May 13, 2021, the district court granted Mother a protection order against Father.

{¶ 6} Our record contains multiple iterations of the Kentucky protection order. However, our record contains no other documents relating to the Kentucky judicial proceedings. Our record does reflect that Mother's request for a protection order was premised on claims that Father was mentally and physically abusive towards her while they lived together in Ohio.

{¶ 7} The protection order named Mother, Nathan, and Paige as protected

---

other minors and adults referred to in this opinion. Pseudonyms are indicated by the use of quotation marks in the first instance of referring to the individual.

parties. The protection order specified that Father was restrained from any "unauthorized" contact with Mother or the other protected parties. More specifically, the protection order stated that Father was restrained from any contact or communication with the minor children, "except as follows (the following contact or communication is authorized): no violent or unlawful contact with the minor children."

{¶ 8} The protection order also provided that Father was to remain at least 500 feet away from Mother and children, "except as follows: see above." The "see above" apparently referred to the exception listed above regarding prohibited communication.

{¶ 9} The Fayette County Juvenile Court held a hearing on Father's parentage complaint in July 2021. The transcript of that hearing was not included in our record. But the court issued an August 2021 "Agreed Entry" memorializing the agreement reached at that hearing.

{¶ 10} The Agreed Entry stated Father was Paige's biological father. The Agreed entry stated that Mother "shall remain" the residential parent and legal custodian of the parties' two children. The court ordered Father to pay child support.

{¶ 11} The Agreed Entry also provided that the juvenile court had advised the parties that due to the existence of the protection order, "the Court could not order visitation [with Father] to supersede the protection order." The record of the subsequent proceedings in this case reflects that the court and parties interpreted the protection order to prohibit *any* communication or contact between Father and the children while the order remained active.

{¶ 12} Other than stating that the court could not order visitation, the Agreed Entry stated nothing regarding Father's parental rights and responsibilities with respect to Paige. The Agreed Entry appears to constitute an order designating Mother as the sole residential parent and legal custodian of Paige, and an order dictating Father's

responsibility to support Paige, issued pursuant to R.C. 3109.04(A)(1). That is, the Agreed Order was not a shared parenting order issued pursuant to R.C. 3109.04(G).

{¶ 13} Around two years later, in May 2023, Father moved for visitation with the children.[3] Father also asked the court to appoint a guardian ad litem. The court appointed Kathryn Hapner to act as guardian ad litem for the children.

{¶ 14} On September 1, 2023, the juvenile court held a hearing at which Father, Father's counsel, and the guardian ad litem were present. Mother failed to appear.

{¶ 15} The court thereafter issued an entry granting Father temporary visitation with Paige. The entry stated that the decision to order visitation was based upon the guardian ad litem's recommendation. The entry ordered visitation between Father and Paige every Friday between 4:00 p.m. and 8:00 p.m., beginning on September 8, 2023. The court further ordered that visitation would take place in the presence of mother's adult son from a prior marriage, "Lincoln."

{¶ 16} In October 2023, Mother filed a pro se motion requesting a continuance of a pre-trial hearing scheduled in November 2023, stating that she was attempting to locate counsel. The court denied this motion, finding that Mother had sufficient time to locate counsel and that requesting a continuance three weeks prior to the hearing was a "delaying tactic" on Mother's part.

{¶ 17} In November 2023, an attorney appeared in the case on behalf of Mother. The court held a pre-trial hearing on November 6. The court then subsequently issued an entry dated November 14, 2023 concerning this hearing. The entry indicated that it was disclosed to the court that visitation between Father and Paige had not yet occurred and that this was because "the named supervisor [Lincoln] was unwilling to supervise the visit

---

3. This appeal only concerns Father's request for visitation with Paige.

due to perceived alleged threats." The court directed the parties to submit proposed visitation schedules to the court.

{¶ 18} The parties submitted proposed visitation schedules. On November 16, 2023, the court issued an entry stating that visitation between Father and Paige would occur every Saturday, commencing November 25, 2023, from 11:00 a.m. to 4:00 p.m. and that exchanges would occur at a McDonald's located in Ripley, Ohio. The court further ordered that visitation would be supervised by either Lincoln or another individual, "Todd."[4]

{¶ 19} In December 2023, Father moved the court for an order modifying the allocation of parental rights and responsibilities and naming him as Paige's residential parent and legal custodian.

{¶ 20} The same month, Mother moved to modify the visitation schedule. Mother stated that the court had indicated in a telephone conference that the parties should meet "halfway" to exchange Paige. But Mother pointed out that the court's most recent temporary visitation order specified that the parties would meet in Ripley, Ohio, which was not halfway between Mother's home and Father's home. Instead, Mother stated that she would have to drive a total of four hours to Ripley and back home while Father was only required to drive two-and-a-half hours total. Mother proposed that the parties exchange Paige in Paris, Kentucky.

{¶ 21} On January 22, 2024, the trial court issued an order modifying the temporary visitation arrangement. This was an agreed order signed by the parties. The order greatly expanded Father's visitation with Paige. The order provided that Father would have visitation with Paige every other weekend. The order further specified that

---

4. It is unclear from our record how Todd is related to the parties.

when school was over for the year, Father would have visitation with Paige every other week. The order also specified the parties would meet to exchange Paige at a McDonald's in Paris, Kentucky.

{¶ 22} The various motions filed by the parties came before the court for a full hearing in July 2024. The following is a summary of the relevant testimony and evidence. Before we continue, we pause to note two issues. First, a considerable amount of the testimony at trial was objected to on various grounds, but primarily on hearsay grounds. The majority of these objections were sustained. In our summary, we only refer to admissible, non-stricken testimony.

{¶ 23} Second, much of the parties' testimony involved issues relating to the best-interest analysis with respect to the allocation of parental rights and responsibilities. As these facts are ultimately not relevant to our analysis in this appeal for reasons described below, we limit our discussion of the testimony to facts relevant to the juvenile court's change-in-circumstances analysis.

### A. Evidence Adduced at the Full Hearing

### 1. Father's Testimony

{¶ 24} Father testified that Paige was three years old when she began living in Kentucky with Mother. At the time of the full hearing, she was six years old. Following the issuance of the protection order, Father understood that the protection order prohibited him from having any contact with Paige for two years. He waited the two years, then filed for visitation. Father had his first visit with Paige on November 25, 2023.

{¶ 25} At his first visit with Paige, Lincoln and Lincoln's wife were present. Due to concerns over the protection order, Father stayed at a gas station while Lincoln went to McDonald's and retrieved Paige. When Lincoln returned with Paige, Paige's clothes were covered in vomit. (The record reflects that Paige got car sick while travelling with Mother

- 6 -

to the exchange.)

{¶ 26} The group left with Paige and went to Walmart and bought Paige new clothes and some toys. Lincoln's wife took Paige to a bathroom to change her into her new clothes. While doing so, she found a tracking device hidden in Paige's shoe. They then visited the Newport Aquarium.

{¶ 27} Later, when the group dropped Paige off with Mother, Father observed Lincoln arguing with Mother from across the street. He observed Mother "stripping" Paige down in front of many people. Mother removed the clothes that Father had bought Paige. Paige also was not allowed to bring back any of the toys that Father had bought.

{¶ 28} Father testified that on his first weekend-long visit with Paige, as soon as he arrived home a sheriff's deputy appeared to conduct a wellness check on Paige.

{¶ 29} Father testified that he was supposed to have visitation with Paige over Christmas but Mother cancelled because Paige was sick. Father testified that Mother did not provide him with make-up time for the missed Christmas visit.

{¶ 30} In the summer, Father had Paige every other week. He took her and Nathan on a Bahamas cruise vacation. When they returned from the cruise, they were stopped by border patrol agents and not allowed to leave the ship. Paige and Nathan were with Father during this incident and both children were upset. The border patrol agents interviewed him. Father learned he had been detained because of the protection order. He never learned how border patrol had received a copy of the protection order. Ultimately, about an hour and a half later, he was released.

{¶ 31} Father testified that he was not able to see Paige on her birthday, but that Paige's paternal grandmother (that is, Father's mother) traveled to Kentucky to attend Paige's birthday party. Father agreed that his mother was not "welcomed" by Mother's family and testified that she had to spend the day in an emergency room where she was

checked for a fractured skull. (More details concerning this incident are contained in the guardian ad litem's testimony, below.)

## 2. Mother's Testimony

{¶ 32} Mother testified that she missed the hearing at which the court first granted Father parenting time with Paige between 4:00 p.m. and 8:00 p.m. on Fridays. She was not sure if the court's order was in Eastern Time (where the court was located and Father lived) or Central Time (where she and Paige lived). She stated that at the time, she was trying to locate an attorney. Mother testified that neither Father nor Father's counsel ever contacted her about making arrangements for Friday visits.

{¶ 33} Mother stated that she was cooperative with the court orders on visitation after Father began visits with Paige. With regard to Paige missing her Christmas visit with Father, Mother stated that she gave Father extra parenting time. Specifically, she gave Father extra parenting time at the end of his Bahamas vacation.[5]

{¶ 34} Mother admitted that she placed an "airtag" tracker in Paige's shoe for the first visit with Father and she did so because she was concerned about who would be supervising the visitation. She did not recognize one of the names identified as a possible supervisor (presumably, Todd).

{¶ 35} Mother denied that she ever called for a wellness check on Paige when she was on visits with her father. Mother testified that she knew nothing about it at the time, but her sister later revealed to her that she had called for the wellness check.

{¶ 36} Mother told her version of events concerning removing Paige's clothes at the first visit with Father. She explained that she had also purchased Paige a new set of clothes. She claimed to have changed her out of her clothes inside her vehicle, and that

---

5. Father confirmed asking for and receiving for additional parenting time at the conclusion of the Bahamas vacation.

Paige was shielded from the public's view.

{¶ 37} Mother denied that she contacted anyone about the protection order when Father was on the cruise. She also denied asking anyone else to forward the protection order to border patrol.

{¶ 38} Mother stated she knew nothing about her sister assaulting Father's mother. She said her sister had not been arrested for any offense.

{¶ 39} Mother believed that Paige should remain in her custody, and have visits with her Father. She believed Paige was doing well in her Kentucky home. Mother also stated that Paige was doing well when she spent time with her Father.

{¶ 40} On cross-examination, Mother admitted denying Father parenting time, but only when the court had ordered visitation on Fridays from 4:00 p.m. to 8:00 p.m. with no location provided for the exchange.

### 3. Guardian ad Litem Katherin Hapner's Testimony

{¶ 41} Guardian ad litem Kathryn Hapner testified concerning her custody recommendation. Hapner testified that in her first guardian ad litem report, she had recommended that custody continue with Mother. However, she had changed her mind and now recommended that custody be granted to Father.

{¶ 42} Hapner's reasons for changing her recommendation were that Mother had been "ignoring" court orders. Specifically, Mother ignored the court's initial orders granting Father visitation with Paige. Hapner also noted that Father had not received a visit with Paige over Christmas, and that this was due to Paige being sick. But according to Hapner, Mother was not "cooperative" with making up this missed parenting time.

{¶ 43} Hapner believed that Mother obtained the protection order to deny Father parenting time with Paige and agreed that she was "aware" that Mother had used the protection order against Father on a recent trip. She stated that Father, Paige, and Nathan

had gone to Florida for a Bahamas cruise. When they returned to port, border patrol officers stopped them because they had been notified that there was a protection order that prevented Father from having contact with his children. Hapner was not able to determine who provided border patrol with the protection order.

{¶ 44} Hapner testified that Paige's paternal grandmother, who is in her 80s, had visited Kentucky for Paige's birthday party. Mother reported to Hapner that the grandmother was told to leave the party and that Mother's sister had followed the grandmother to a store and assaulted her in the store. Mother "downplayed" this incident to Hapner.

{¶ 45} Hapner also described her concerns with what occurred at the conclusion of Paige's first visit with Father, stating that Mother's actions at the exchange were "completely unnecessary" and an "unnecessarily traumatic" situation in which to place a child.

{¶ 46} Finally, Hapner testified that Mother had failed to post her payment for Hapner's guardian ad litem fees. Ultimately, Hapner recommended that the court grant Father custody and provide Mother with parenting time.

**B. Juvenile Court's Decision**

{¶ 47} The juvenile court issued a decision on the various motions on August 5, 2024. In its decision, the court summarized the final hearing testimony discussed above. The court stated that, upon request, it had interviewed Paige *in camera* but determined that she did not have sufficient reasoning ability to express her wishes and concerns with respect to the allocation of parental rights.

{¶ 48} The court first considered whether or not a change of circumstances had occurred with respect to Paige or Mother. The court found that a change of circumstances had occurred. Specifically, the court found that Mother had "created and encouraged a

hostile environment for the child in an attempt to alienate the child from Father." The court listed the following as supporting this conclusion: (1) "Mother's delay in allowing visitation," (2) "her efforts to prolong the litigation of this matter," (3) "her family's interference with Father's visitation," (4) "putting a tracking device on the minor child," and (5) "not allowing [Paige] to keep clothes or toys that Father purchased."

{¶ 49} Having found a change in circumstances, the court then proceeded to consider whether a change in custody was in Paige's best interest. Most of the factors considered by the court did not appear to weigh strongly for or against custody in favor of one parent or the other. However, the court noted that it found that Father was the parent more likely to honor and facilitate court-approved parenting time and that Mother had "willfully and continuously (for a period of time) interfere[d] with Father's right to parenting time in accordance with an order of the court."

{¶ 50} Ultimately, the juvenile court found that it was in Paige's best interest that the court modify the custody order, grant legal custody to Father, and designate Father as Paige's residential parent. The court further ordered that Mother would be awarded parenting time.

### C. Post-Decision Activities

{¶ 51} Following the juvenile court's decision, Mother filed a request for findings of fact and conclusions of law. Mother pointed out that while the court had made best-interest findings, the court had not made any findings with respect to R.C. 3109.04(E)(1)(a)(iii), which states that a court shall not modify a decree allocating parental rights unless the modification is in the best interest of the child *and* that the harm likely to be caused by a change of environment is outweighed by the advantages to the change of environment to the child. The court's earlier entry had not discussed this latter "harm-outweighed" finding.

{¶ 52} The court then issued a judgment entry on August 29, 2024 which adopted

- 11 -

its previous entry granting Father legal custody and adding a finding that "the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment of the child." The entry indicated that the modification of custody would "overcome the alienation that has been created by mother and allow the child to have a relationship with her father that she otherwise would not be able to establish."

{¶ 53} Mother appealed from this entry and raised two assignments of error.

## II. Law and Analysis

### A. Change of Circumstance Finding

{¶ 54} Mother's first assignment of error states:

> THE TRIAL COURT ERRED WHEN IT FOUND THAT THE FATHER ESTABLISHED THAT AN APPROPRIATE CHANGE IN CIRCUMSTANCES HAD OCCURRED REGARDING THE CHILD.

{¶ 55} Mother argues that the juvenile court erroneously found a change in circumstances justifying a modification of Paige's custody. Mother states that the court based its finding of a change in circumstances upon evidence that (1) Mother created a hostile environment for the child, and (2) Mother's actions caused the child to be alienated from Father. Mother states that the court issued five factual findings in support of these two determinations, but that all five findings were either erroneous or did not support either of the two predicate findings (hostile environment and alienation) establishing the change in circumstance.

### 1. Law Governing Custody Modification

{¶ 56} R.C. 3109.04(E) governs the modification of a prior decree allocating parental rights and responsibilities. The statute provides:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior

decree, *that a change has occurred in the circumstances of the child, the child's residential parent* . . . and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree . . . unless a modification is in the best interest of the child and one of the following applies:

(i) The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.

(ii) The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

(Emphasis added.) R.C. 3109.04(E)(1)(a).

{¶ 57} The circumstances described in subsections (i) and (ii) do not apply in this case. So the statute allowed the juvenile court to modify Paige's residential parent and legal custodian if it made three findings: (1) that a "change has occurred in the circumstances" of Paige or Mother, the residential parent; (2) that the modification is in the "best interest" of Paige; and (3) that the advantages of the "change of environment" outweigh any likely harm from the change. R.C. 3109.04(E)(1)(a); *In re J.L.C.*, 2023-Ohio-4081, ¶ 48 (12th Dist.).

{¶ 58} R.C. 3109.04 does not define "change . . . in the circumstances." *Matter of B.H.H.,* 2017-Ohio-8359, ¶ 24 (12th Dist.). Ohio courts have held that the phrase denotes "'an event, occurrence, or situation which has a material and adverse effect upon the child.'" *Id*., quoting *Pierson v. Gorrell*, 2012-Ohio-3878, ¶ 13 (12th Dist.). In order to justify an abrupt disruption in the child's home life, the change in circumstances must be substantial, not slight or inconsequential. *Id*., citing *Pierson* at *id*. Accord *Lykins v. Lykins*,

- 13 -

2020-Ohio-2769, ¶ 13 (12th Dist.). Combining these two descriptions, a change in circumstances means a substantial event, occurrence, or situation, involving Mother or Paige, that had a material and adverse effect upon Paige. *See Matter of B.H.H.* at ¶ 24.

### 2. Burden of Proof

**{¶ 59}** The party seeking to modify an order allocating parental rights and responsibilities has the burden of proving that a change in circumstances has occurred. *Oyedare v. Oyedare*, 2019-Ohio-2794, ¶ 24 (12th Dist.), citing *Elam v. Elam*, 2001 WL 1566839, *2 (12th Dist. Dec. 10, 2001).

### 3. Standard of Review

**{¶ 60}** The discretion that a trial court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.*, 2009-Ohio-4824, ¶ 17 (12th Dist.), quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A juvenile court's finding that a change in circumstances occurred under R.C. 3109.04 should not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 1997-Ohio-260, at paragraph one of the syllabus.

**{¶ 61}** "When applying the abuse-of-discretion standard, an appellate court's role is to ascertain whether the award of custody is supported by competent and credible evidence." *In re D.M.*, 2011-Ohio-3918, ¶ 25 (12th Dist.), citing *Flickinger*. "In reviewing a custody determination, an appellate court must 'review the record to determine whether there is any evidence in support of the prevailing party.'" *Lyle v. Kersey*, 2000 WL 895268, *1 (12th Dist. Jun. 30, 2000), quoting *Ross v. Ross*, 64 Ohio St.2d 203, 206 (1980). *Accord Romohr v. Singer*, 12th Dist. Clinton CA2021-06-019, 2022-Ohio-50, ¶ 26 (quoting the same). "No abuse of discretion will be found provided there is a substantial amount of credible and competent evidence to support the trial court's findings." *Lyle* at *1, citing

*Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23 (1990).

**4. Parental Alienation**

{¶ 62} The trial court's decision rested on its conclusion that Mother engaged in parental alienation. In *In re J.L.C.*, 2023-Ohio-4081 (12th Dist.), we described the concept of "parental alienation" as

> generally referring to a situation in which one parent attempts to damage the relationship between a child and the other parent. This can take the form of "badmouthing" the other parent, limiting access to the child, or encouraging the child to reject the other parent. The concern is that this behavior can have serious negative effects on the child and the relationship between the parents.

*Id*. at ¶ 26.

{¶ 63} In *Romohr v. Singer*, 2022-Ohio-50 (12th Dist.), we quoted a definition of "parental alienation" from the testimony of a licensed marriage and family therapist: "a highly dysfunctional cross-generational alliance between the child and the triangulating parent to the disruption, dismissal and sometimes utter rejection of the child's other parent absent a bona fide protective reason." *Id*. at ¶ 13.

{¶ 64} In *Romohr*, we found credible evidence that the mother had engaged in "a pattern of behavior that has caused alienation between the children and Father, and that such an environment is unsafe for the children." *Id.* at ¶ 41. In *Fetty v. Fetty-Omaits*, 2003-Ohio-661 (5th Dist.), the court found that the evidence supported a finding of a change in circumstances where the mother had remarried a man with children, moved her four children into the man's two bedroom home, "severely" interfered with the father's visitation, prevented the children from communicating with the father, and continually made comments to the children "so as to surround the children with an atmosphere of animosity toward [the father] and his wife." *Id*. at ¶ 44-49.

{¶ 65} In sum, parental alienation involves repeated efforts by one parent to harm

- 15 -

a child's relationship with the other parent, and the absence of a valid reason to do so. Parental alienation could establish a finding of a change in circumstances, provided that the evidence supports the conclusion that the alienation has caused a material and adverse effect on the child.

### 5. Analysis of Change of Circumstances Finding

{¶ 66} The juvenile court found that a change of circumstances occurred here when Mother "created and encouraged a hostile environment for the child in an attempt to alienate the child from Father." Notably, the court stated in the initial entry awarding Father custody that Mother had created a hostile environment in an "attempt" to alienate Paige, implying that Paige was not in fact alienated from Father. However, in the subsequent entry in which the court found that the benefit of transferring custody to Father outweighed any harm, the court stated that Paige was alienated from Father and that the change in custody would resolve this alienation.

{¶ 67} The court cited the following findings as supporting its conclusion that Mother had created a hostile environment, thus alienating Paige from Father: (1) Mother delaying visitation with Father; (2) Mother prolonging litigation of the custody dispute; (3) Mother's family's interference with Father's visitation; (4) Mother placing a tracking device on Paige during Father's visit; and (5) Mother not allowing Paige to keep clothes or toys given to her by Father.

{¶ 68} Mother argues that all five of these findings are not supported by record evidence, so they do not support the trial court's conclusion that Mother created a hostile environment, or alienated Paige. We will review each finding as it relates to the determination of a change in circumstance.

**a. Delayed Visitation**

{¶ 69} The juvenile court ordered Father to have supervised visitation with Paige beginning in September 2023. However, Father did not actually begin visitation with Page until November 25, 2023. Mother argues that the two-month delay in starting Father's visitation with Paige was not due to her intentionally delaying visitation and ignoring the court's orders, but rather, confusion concerning the court's visitation orders. Mother asserts that while the case was pending, the court issued a total of four temporary visitation orders, each modifying or adding clarity to the previous order, which was necessary for the parties to understand the visitation order and comply with it.

**1. First Order**

{¶ 70} On September 11, 2023, the court issued its first temporary order on visitation following the hearing at which Mother was not present. The order stated that Father would have visitation with Paige every Friday from 4:00 p.m. to 8:00 p.m., that these visits would be supervised by Lincoln, and that the visits would continue for 8 weeks.

{¶ 71} Mother asserts that there were several problems with the order. First, the order specified that the visits would be supervised by Lincoln, but made no contingencies about who would supervise the visits if Lincoln could not or would not supervise the visits. The record reflects that Lincoln, at least initially, refused to supervise the visits.

{¶ 72} Second, Mother asserts that the order did not specify where exchanges would take place. Mother notes that the parties lived approximately 228 miles apart and the driving time between the two homes was approximately four hours.

{¶ 73} Third, Mother states that the order did not specify what time zone was applicable and that Mother and Paige lived in a different time zone than Father.

{¶ 74} Mother testified at the hearing that she attempted to get clarity from the

- 17 -

juvenile court as to the "process" of complying with the visitation order and as to which time zone was applicable but was not able to get clarity on these issues. Mother also testified that she was never contacted by Father, Father's counsel, or the guardian ad litem to arrange these initial Friday visits.

### 2. Second Order

{¶ 75} On November 14, 2023, the juvenile court issued a second order addressing Father's temporary visitation. The order stated that the court had learned that no visitation had taken place because the "named supervisor was unwilling to supervise the visit due to perceived alleged threats." The court directed the parties to submit proposed schedules for the parties to meet at a halfway point and for the visits to be supervised. Mother argues that this second order implicitly indicated that the first temporary visitation order was deficient by failing to specify a backup supervisor or an exchange point.

### 3. Third Order

{¶ 76} In the third order, issued two days after the second order, the juvenile court again noted that no visitation had taken place and that this was because Lincoln was unwilling to supervise the visits and there was a civil protection order in place. The court, presumably in response to the parties' proposed visitation schedules, ordered Paige's visitation with Father to occur every Saturday, from 11:00 a.m. to 4:00 p.m. The order specified that the exchanges would occur at a McDonald's location in Ripley, Ohio and would be supervised by either Lincoln or Todd.

{¶ 77} Mother states that Father received his first visit nine days after the issuance of this third order. Mother argues that the delay in the start of Father's visitation was not due to her conduct or attempts to delay visitation, but rather because of the aforementioned issues with the first temporary order.

**{¶ 78}** In his appellate brief, Father does not directly address Mother's argument concerning whether the delay in starting visitation was due to inadequacies in the court's temporary orders or rather due to Mother's conduct. Instead, Father refers to evidence he contends supports the conclusion that Mother created hostility and frustrated visitation with Father. Specifically, Father argues that visitation was delayed because Mother threatened Lincoln, causing him to decline to supervise the visits with Father.

**{¶ 79}** The problem with Father's argument is that there is no competent evidence cited by Father, or which we could locate in the record, to support the conclusion that Mother threatened Lincoln in an effort to prevent or frustrate visitation with Father. At the hearing, Mother never testified regarding this alleged threat, and no one questioned her about threatening Lincoln. Lincoln was not called to testify at the hearing.

**{¶ 80}** In support of his position that Mother threatened Lincoln concerning these visits, Father cites only one document in the record, the November 14, 2023 entry on temporary visitation (that is, the second temporary order discussed above). This document memorialized a pre-trial hearing. That entry specified that the individuals participating in the pre-trial hearing were the parties' attorneys and the guardian ad litem and that a "discussion was held regarding visitation" and that it was "disclosed that no visitation had yet occurred as the named supervisor was unwilling to supervise the visit due to perceived alleged threats."

**{¶ 81}** There is no indication in the entry that any testimony was taken at this hearing. The transcript of this hearing was not provided on appeal. The entry does not state who disclosed this information about threats to the court. Nor does the entry even indicate that Mother was the person disclosing the threats. An apparent hearsay statement provided to the court, concerning "perceived" threats from an unknown source, does not constitute competent credible evidence upon which the court could find that

Mother obstructed visitation, and this "finding" could not be relied upon by the juvenile court in making a custody determination.

{¶ 82} Upon review of the record, we find a lack of competent and credible evidence supporting the juvenile court's conclusion that Mother's conduct delayed visitation and thus caused a hostile environment and/or alienation between Father and Paige. As set forth above, the delays in visitation appear to be the product of the initial order for visitation failing to set forth sufficient information to allow the parties to exchange the child and, more so, the lack of availability of the named supervisor to supervise the visits with no contingency for a backup supervisor. Moreover, Mother claimed that no one contacted her from Father's side in an attempt to coordinate visits. Father did not challenge this assertion by Mother at trial or on appeal.

{¶ 83} The failure to communicate with Mother by Father, Father's counsel, or the guardian ad litem suggests that these individuals anticipated that no visits would occur until these details could be worked out. When the details were worked out, ultimately in the third temporary order, Father began receiving visitation with Paige. Moreover, there was no evidence presented that the two-month delay in starting visitation had any material adverse impact on Paige or caused alienation between Paige and Father. Paige was able to begin visiting with Father in November 2023, and those visits went well and were substantially expanded leading up to the full hearing.

### b. Efforts to Prolong Litigation

{¶ 84} The juvenile court found that Mother created a hostile environment and/or alienated Paige from Father through her "efforts" to prolong the litigation. The juvenile court's decision does not address what conduct formed the basis of this finding. Mother contends that there is no evidence in the record that she engaged in any activity to prolong the litigation.

- 20 -

{¶ 85} Father contends that Mother prolonged the litigation when she "refused to abide" by the court's initial visitation orders and "complained about the distance" she had to travel for visitation. Father argues that these actions lengthened the time necessary for Paige to adjust to visits with Father and "necessitated [Father] seeking custody." Father also points to an entry issued by the court, in response to Mother's pro se motion requesting a continuance of a hearing in order to locate counsel. The court denied Mother's continuance request and found that Mother's delay in seeking counsel was a delay tactic.

{¶ 86} We have already determined that the issues with the drafting of the initial visitation orders were the primary reason that visitation was delayed for two months. Therefore, Mother's "refusal to abide" by the initial visitation orders did not prolong the litigation. Mother may have delayed the litigation by not making better efforts to locate counsel early in the case, as found by the juvenile court. However, the record reflects that Mother secured counsel soon after the court denied her continuance. Regardless, it does not appear from the record that Mother's delay in finding counsel caused any delay in a hearing on the merits. The hearing for which Mother asked for a continuance was not the full hearing on Father's motion for visitation or custody, and instead involved issues regarding the temporary visitation orders. The full hearing was not held until July 2024, more than six months after Mother's request for a continuance.

{¶ 87} Even if Mother had delayed the litigation of the custody dispute, there is no logical connection between the apparent short delay in starting visitation and the court's finding that Mother created a hostile environment and/or alienated Paige. Father was not prevented from reestablishing a relationship with Paige by the time of the final hearing. There was no competent and credible evidence presented that the slight delay had any material or adverse effect on Paige and therefore this finding did not establish a

change in circumstances. *See In re D.M.*, 2011-Ohio-3918 at ¶ 25.

### c. Family Interference with Visitation

{¶ 88} The court found that Mother created a hostile environment and/or alienated Paige from Father based on her family interfering with Father's visitation. Mother argues that the juvenile court's decision did not explain this finding or make any findings in support of the conclusion.

{¶ 89} The record supports the conclusion that Mother's family interfered with Father's visitation with Paige. Specifically, the record reflects that Mother's sister called local law enforcement to conduct a wellness check on Paige within hours of her first weekend visit. Mother testified that she was not involved in her sister's wellness check request. She did not ask her sister to make the request. She herself never requested any wellness checks on Paige during Father's parenting time. There was no contrary evidence submitted suggesting Mother's involvement in requesting the wellness check. Regardless, there was no evidence submitted indicating that the wellness check itself had any material or adverse effect upon Paige.

{¶ 90} The evidence suggests that someone in Mother's family (perhaps her sister) may have been involved in sending a copy of the civil protection order to the border patrol authorities in an effort to interfere with Father's vacation with Paige. However, while this is a possibility, there was no evidence presented concerning how border patrol received this information. Mother testified and denied any involvement in this incident and no contrary evidence was submitted to the juvenile court.

{¶ 91} Finally, the record reflects that an incident took place between Paige's paternal grandmother and Mother's family at Paige's birthday party and afterwards at a store where Mother's sister allegedly assaulted the grandmother. There was no direct testimony about this incident; Neither Mother's sister nor the grandmother appeared at

the hearing to testify about this incident. No one testified about the impact of this incident upon Paige, or whether Paige witnessed the incident.

{¶ 92} Assuming the incident occurred, no evidence was presented demonstrating that Mother was involved in the incident, that the incident caused alienation between Father and Paige, or that the incident had a material or adverse impact on Paige. As such, this incident did not establish competent and credible evidence substantiating a change in circumstances. *See In re D.M.*, 2011-Ohio-3918 at ¶ 25.

### d. Placing a Tracking Device on Paige During Father's First Visit

{¶ 93} The fourth basis cited by the juvenile court for its finding that Mother created a hostile environment and/or alienated Paige was her placement of a tracking device in Paige's shoe. The court did not articulate its rationale for finding that this incident created a hostile environment or alienated Paige.

{¶ 94} Mother admitted at the hearing that she placed the device and stated that she did so because she was concerned for Paige's safety because she did not know the person who was named as a secondary supervisor in the court's third temporary order on visitation.

{¶ 95} There was no evidence presented at the full hearing that the placement of the tracking device on Paige had any material or adverse impact on Paige. In fact, there was no evidence presented that Paige was even aware of the device. We fail to see how placing a tracking device created a hostile environment or caused Paige to be alienated from Father. There was no evidence presented that Mother continued to place tracking devices on Paige after the initial visit. That is, there was no pattern of Mother engaging in this sort of activity. Accordingly, there is no competent and credible evidence supporting the finding that placing a tracking device on Paige created a hostile environment or alienated Paige and so this finding could not support the conclusion that a change in

circumstances occurred.

### e. Not Allowing Paige to Keep Clothes and Toys after Father's First Visit

{¶ 96} The court's final basis for finding that Mother created a hostile environment or alienated Paige was the incident where Mother allegedly changed Paige out of the clothing that Father purchased for her and returned the toys that Father had purchased for Paige. The court also found that Mother put Paige back into the previously-soiled clothes.

{¶ 97} Mother testified at trial that on the day in question she changed Paige into a new outfit. She testified that while Paige was with Father, she purchased a new outfit and it was this outfit that she placed Paige into upon her return from Father's visit. Mother argues that there was no admissible evidence supporting the trial court's finding that she placed Paige into soiled clothing.

{¶ 98} Father contends that there was admissible evidence that Mother placed Paige into vomit-soiled clothing: Hapner's testimony. In fact, Hapner testified that Father informed her that Mother placed Paige into vomit-soiled clothing. Father contends that there was no objection to this testimony.

{¶ 99} We have examined this issue and we do not find that there was competent evidence supporting the trial court's conclusion that Mother placed Paige into vomit-soiled clothing upon her return from the visit. The only testimony supporting this assertion was Hapner's testimony about what Father told her about the incident prior to trial. But Father did not testify at trial that Mother placed Paige into vomit-soiled clothing, only that he observed, from a distance, Mother stripping Paige down in public and that Mother returned the outfit that Father purchased.

{¶ 100} We agree that Mother's behavior at this particular exchange was potentially concerning. That being said, there was no competent and credible evidence presented

by either party concerning how this incident materially and adversely impacted Paige or that there were any additional incidents demonstrating a pattern of this sort of behavior by Mother.

{¶ 101} In summary, and in considering all five bases set forth by the court justifying its change-of-circumstance finding, we conclude that the record does not contain competent and credible evidence to support the conclusion that a substantial event, occurrence, or situation which had a material and adverse effect on Paige occurred. *In re D.M.*, 2011-Ohio-3918 at ¶ 25; *B.H.H.*, 2017-Ohio-8359 at ¶ 24.

{¶ 102} The record indicates that there were issues with initial visitation orders which were later clarified and, once clarified, visitation between Paige and Father began and was proceeding well. Father was able to reestablish contact with Paige and begin the process of developing a relationship largely without interference.

{¶ 103} There were two incidents involving interruption of visits and one incident involving a confrontation between the paternal grandmother and Mother's family. However, the evidence did not establish that Mother was involved in any of those incidents. Nor was there evidence presented as to how these incidents materially and adversely affected Paige. The most concerning event that did relate to Mother's conduct occurred at the first exchange. But that was a single incident that occurred during the first exchange and was not repeated during any subsequent exchanges. There was no evidence presented of any material or adverse impact on Paige. By itself, the incident was not so significant that it would justify a change in custodial parent. And there was no pattern of Mother repeatedly engaging in this sort of activity.

{¶ 104} There was also no evidence presented supporting the juvenile court's finding that Paige was alienated from Father. To the contrary, the evidence established that Paige did well on her visits with Father, was adjusted to his home, and the length of

time that Paige visited with Father significantly increased over time.

{¶ 105} For these reasons, we find that competent and credible evidence did not establish a change in circumstance. The juvenile court therefore abused its discretion in modifying the residential and custodial parent designation. *See In re D.M.*, 2011-Ohio-3918 at ¶ 25. As such, we need not address the best-interest prong, or the conclusion that the benefit of modifying Paige's environment outweighed any likely harm from the change.

{¶ 106} We sustain Mother's first assignment of error. We vacate the August 5 and August 29, 2024 custody orders, and remand to the juvenile court for further proceedings.

### B. Benefit of Custody Change Outweighing Harm

{¶ 107} Mother's second assignment of error states:

> THE TRIAL COURT ERRED WHEN IT FOUND THAT FATHER ESTABLISHED THAT THE HARM TO THE CHILD LIKELY TO BE CAUSED BY A CHANGE OF ENVIRONMENT WAS OUTWEIGHED BY THE ADVANTAGES TO THE CHILD OF A CHANGE OF ENVIRONMENT.

{¶ 108} Mother's second assignment of error challenges the juvenile court's finding that the benefits of changing Paige's environment outweighed the harm likely to be caused. Based on our resolution of the first assignment of error, this assignment of error is moot and need not be addressed. App.R. 12(A)(1)(c).

{¶ 109} Judgment vacated; the matter is reversed and remanded.


M. POWELL and SIEBERT, JJ., concur.

## **J U D G M E N T  E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, vacated and the matter is reversed and remanded.

It is further ordered that a mandate be sent to the Fayette County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge