[Cite as *In re D.R.*, 2026-Ohio-694.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

IN RE: : 

                          CASE NO. CA2025-07-034

D.R., et al. :

                          <u>OPINION AND</u>

:                        <u>JUDGMENT ENTRY</u>
                          3/2/2026

:

:

:

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2025-4028

Davis & Associates, LLC, and Jeffery A. Johns, Jr., for appellant.

TK Law, and Celia Klug Weingartner, for appellee.

## **O P I N I O N**

**HENDRICKSON, P.J.**

{¶ 1} Appellant ("Mother") appeals from a decision of the Clinton County Court of

Common Pleas, Juvenile Division, granting legal custody of her two children to appellee,

the children's paternal great-aunt ("Aunt").[1] For the reasons that follow, we affirm the juvenile court's decision.

{¶ 2}   Dana, born in June 2018, and Mary, born in April 2020, are the daughters of Mother and Father (referred to collectively as the "Children").[2] Mother resides in Hamilton County, Ohio with two of her adult children, while Aunt lives in Clinton County, Ohio with her adult daughter, adult son, and granddaughter.[3] The parties' residences are approximately one hour apart.

{¶ 3}   Mother and Father have an extensive history with Hamilton County Jobs and Family Services ("HCJFS"), which resulted in the Children's placement with Aunt between August 2019 and April 2022.[4] In April 2022, the Children were returned to Mother and Father's care but continued routinely visiting with Aunt at her home, including overnights, weekend visits, and visits lasting more than one week at a time. In January 2025, pursuant to a safety plan initiated by HCJFS, the Children were placed with Aunt while Mother and Father worked on various case plan services. At the time, HCJFS was concerned with the family's "out of control behavior and drug use."

{¶ 4}   On February 25, 2025, Aunt filed a complaint for custody of Dana and Mary. At that time, the Children were living with Aunt pursuant to the safety plan. In her complaint, Aunt alleged that the Children had been in her care since October 2022; that the Children attend school in Aunt's school district; and that she provides for the Children

---

1. The children's father, D.R. ("Father"), did not participate in the underlying proceedings and did not file an appeal in this matter. As such, we tailor our discussion and analysis to the facts concerning Mother.

2. "Dana" and "Mary" are pseudonyms that we use for purposes of protecting the minor children's privacy and for improving the readability of this opinion. *In re P.L.*, 2025-Ohio-5693, ¶ 1, fn. 2 (12th Dist.).

3. Mother has eight total children, four of whom are adults. At the time of the final hearing in this case, the four minor children, as well as the youngest adult child, did not live with Mother, but lived with various family members.

4. HCJFS placed Dana with Aunt in August 2019, when Dana was approximately 14 months old. HCJFS placed Mary with Aunt a few days after Mary's birth in April 2020.

in a variety of ways. Aunt further alleged that HCJFS intended to file for custody of the Children and had encouraged her to file for custody herself.

{¶ 5} On March 13, 2025, Aunt moved the juvenile court for interim custody of the Children. In her motion, Aunt alleged that placing the Children with Aunt would allow the Children to remain in a safe and known environment during the proceedings. She further alleged that Mother did not contest her request for interim custody at that time. After a hearing, the juvenile court issued a decision, entry, and order granting interim custody of the Children to Aunt, awarding Mother supervised parenting time with the Children, and suspending Father's visitation time. In its decision, the court noted that, despite being served, Father failed to appear at, or request a continuance of, the hearing. The court also stated that Mother appeared at the hearing and agreed with the court's decision to award interim custody of the Children to Aunt.

{¶ 6} At Aunt's request, the court appointed a guardian ad litem ("GAL"). The GAL conducted an investigation into the family and filed a report recommending that Aunt be granted full custody of the Children; that Mother be granted weekly parenting time; that the Children should be enrolled in mental health services; and that Father not have any contact with the Children. The matter proceeded to a final hearing on Aunt's complaint on June 5, 2025. At the time of the hearing, Dana was six years old and Mary was five years old. The juvenile court heard testimony from Aunt, an ongoing caseworker from HCJFS, Mother, and the GAL. The parties filed written closing arguments, and the juvenile court took the matter under advisement.

{¶ 7} On June 20, 2025, the juvenile court issued a decision, entry and order in which it granted Aunt legal custody of the Children, continued Mother's weekly supervised parenting time, and suspended Father's parenting time until further court order. In so doing, the court found, by a preponderance of the evidence, that "the parents are

incapable of caring for the [C]hildren, and awarding custody to either parent would be detrimental to the [C]hildren's wellbeing." The court also found that an award of legal custody to Aunt was in the Children's best interest.

{¶ 8} Mother now appeals, raising the following assignment of error for our review:

{¶ 9} THE TRIAL COURT'S [sic] ERRED WHEN IT DETERMINED THAT BY A PROPERDERANCE OF THE EVIDENCE THAT MOTHER [IS] AN UNSUITABLE PARENT.

{¶ 10} On appeal, Mother does not challenge the juvenile court's finding that an award of legal custody to Aunt was in the best interest of the Children. Instead, she contends the juvenile court abused its discretion by concluding that she is an unsuitable parent.

{¶ 11} Legal custody is not as drastic a remedy as permanent custody because parents retain residual rights, privileges, and responsibilities. *In re C.R.*, 2006-Ohio-1191, ¶ 17. Nonetheless, "the overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Hockstok*, 2002-Ohio-7208, ¶ 16. "Ohio courts have sought to effectuate the fundamental rights of parents by severely limiting the circumstances under which the state may deny parents the custody of their children." *Id*. at ¶ 17.

{¶ 12} In a custody proceeding between a parent and a nonparent under R.C. 2151.23(A)(2), the juvenile court may not award custody to the nonparent without first determining that the parent is unsuitable. *Id*. A parent may be found unsuitable "only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable

-- that is, that an award of custody would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, 98 (1997); *Morrison v. Robinson*, 2013-Ohio-453, ¶ 10 (12th Dist.). "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *Hockstok* at ¶ 17.

{¶ 13} When reviewing custody issues, a juvenile court's decision is granted great deference and will not be disturbed on appeal absent an abuse of discretion. *In re A.C.C.*, 2018-Ohio-4719, ¶ 40 (12th Dist.). An abuse of discretion implies that the juvenile court acted unreasonably, arbitrarily, or unconscionably. *Id*. When applying an abuse-of-discretion standard, a reviewing court is not free to merely substitute its judgment for that of the juvenile court. *Id*. The discretion afforded to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). A deferential review in a child custody case is appropriate because much may be evident in the parties' demeanor and attitude that does not translate well to the record. *Davis v. Flickinger*, 1997-Ohio-260, ¶ 15.

{¶ 14} In this case, the juvenile court determined Mother is an unsuitable parent pursuant to the third and fourth circumstances identified by *Perales*, that is, because (1) she is incapable of caring for the Children and (2) awarding custody to her would be detrimental to the Children's well-being. On appeal, Mother argues the record does not support either of these findings, and that the juvenile court applied the incorrect legal standard when finding her incapable of caring for her children. Because it is dispositive of Mother's appeal, we will begin our analysis by addressing whether the court abused its discretion when it concluded that awarding custody of the Children to Mother would be detrimental to their well-being.

{¶ 15} If a court makes an unsuitability determination on the basis that parental custody would be detrimental to the child, the court "must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent." *In re Dunn*, 79 Ohio App.3d 268, 271 (3d Dist.1992), citing *Perales* at 98. "However, in the context of a parent's suitability, it is impossible to consider whether placing custody with a parent would be detrimental without considering the specific child in question and how giving custody to the parent would affect that child's welfare." *In re J.M.*, 2009-Ohio-4824, ¶ 25 (12th Dist.). In looking at whether parental custody would be detrimental to a child, it has become "increasingly common for courts to weigh the emotional and psychological (as well as the physical and mental) effects which a custody award may have on the child." *Perales* at 98, fn. 11.

{¶ 16} In its decision, the juvenile court identified the key facts it considered when determining the parents are unsuitable in this case. In relevant part, the court stated that

> [Mother's] testimony relating to her positive drug test in 2025, where the [C]hildren were residing over the last five years, her involvement or lack of involvement in the [C]hildren's medical and educational challenges, her mental health and drug history, and her ongoing involvement in a domestic violence relationship with the [C]hildren's father establish for this Court that she is unsuitable. The GAL report and testimony outline facts which also establish by a preponderance of the evidence that both parents are unsuitable to care for these children.

The court also identified additional, but similar, facts it relied upon to find the parents incapable of caring for the Children.

{¶ 17} On appeal, Mother claims the juvenile court could not have found that an award of custody to her would have been detrimental to the well-being of the Children because no evidence was shown to prove that the Children were harmed by her actions. In support, Mother cites to the Ohio Supreme Court's decision in *In re Burrell*, 58 Ohio St.2d 37 (1979) and this court's decision in *In re A.V.*, 2021-Ohio-3873 (12th Dist.), for

the proposition that "absent evidence showing an adverse impact upon a child[,] a court cannot find that a child has been adversely impacted by a parent's behavior." On this basis, Mother argues the juvenile court could not have found her to be unsuitable without some evidence that her behavior adversely impacted the Children.[5]

{¶ 18} After a thorough review of the record, we conclude the juvenile court did not abuse its discretion by determining that awarding custody of the Children to Mother would be detrimental to their well-being. Mother initially argues that there was no evidence establishing that her alleged drug use adversely or negatively impacted the Children. We disagree. At the hearing, the juvenile court heard significant testimony concerning Mother's substance abuse. Aunt testified that Dana was initially removed from the parents' care in 2019 due to concerns with the parents' drug use and the conditions of their home. The following year, in April 2020, the parents' caseworker asked Aunt to take placement of Mary due to the presence of drugs in Mary's cord blood. Mary suffered from withdraw symptoms after birth and remained in the hospital for approximately three weeks as a result. Although Mother testified that Mary's exposure was limited to Suboxone or Subutex, which Mother used as part of her drug treatment, other evidence established that gabapentin was found in Mary's cord.[6] Upon her release from the hospital, Mary went

---

5. We note that *In re Burrell* and *In re A.V.* each concern an adjudication pursuant to R.C. 2151.04(C), which requires evidence that a parent's conduct is having "an adverse impact upon the child sufficiently to warrant state intervention," and involves a heightened burden of proof. *See Burrell* at 39; *In re A.V.* at ¶ 22. In those proceedings, such an adverse "impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *Id*. Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence. It is that quantum of evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re A.W.-G.*, 2004-Ohio-2298, ¶ 7 (12th Dist.). By contrast, preponderance of the evidence is simply "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." *Id*., citing *Black's Law Dictionary* (6th Ed. 1998).

6. Mother also testified that, in October 2024, she had been sober for six years. Notably, Mother's alleged six years of sobriety would include the date Dana was removed from Mother's care in 2019, which was due, in part, to Mother's drug use, as well as the date Mary was removed in 2022, which was a result of the same.

to live with Dana at Aunt's home.

{¶ 19} As discussed above, the Children returned to the parents' care two years after Mary's birth but continued regularly visiting Aunt. Thereafter, in October 2024, Mother and Father were involved in an argument over the telephone. At that time, Father was receiving drug treatment at a rehabilitation facility and someone at the facility disconnected the line.[7] After the line disconnected, Mother informed the facility that if she could not speak with Father, she was going to kill herself. HCJFS learned of Mother's threat of self-harm, which prompted the agency's renewed involvement with the family. Mother admitted to Aunt that she used drugs with Father that month and ultimately tested positive for cocaine and methamphetamine in January 2025. After Mother's positive drug screen, HCJFS placed the Children with Aunt pursuant to the safety plan. Since then, Mother continued to test positive for illegal substances, with her most recent positive screen occurring in March 2025, the month after Aunt filed her motion for legal custody and three months prior to the final hearing.

{¶ 20} Based upon the above, we find the record contains evidence that Mother's continued drug use has adversely impacted the Children. Although Mother testified she is sober and denied that she has used drugs since October 2024, the record reflects Mother is consistently dishonest regarding her substance abuse.[8] Contrary to Mother's claim of extended sobriety, Aunt, the GAL, and the HCJFS caseworker all testified regarding their concerns surrounding Mother's substance abuse, including her history of substance abuse, as well as her recent positive drug screens, lack of participation in drug

---

7. At the time of the incident, Mother was receiving drug treatment at the same facility but was not involved in treatment at the time of the hearing.

8. Mother testified she was no longer using substances and had not failed any urine screens since April 2025. She acknowledged the positive drug screen from March 2025 but stated her drug use in October was a "one-time use" and could not explain why the test remained positive five months later.

treatment, and her possibility of relapsing. The Children were removed from Mother's care for several years due to her drug use while they were very young. After the Children returned to her custody, Mother's continued drug use resulted in HCJFS implementing the current safety plan, which formally placed the Children with Aunt, and resulted in Aunt's motion for legal custody. Although Mother contends her drug use does not adversely or detrimentally impact the Children, it has undoubtedly resulted in their removal from her care on several occasions and has created a persistently unstable environment for the girls. *See In re Z.D.*, 2020-Ohio-234, ¶ 34 (12th Dist.).

{¶ 21} Mother next argues the juvenile court incorrectly based its unsuitability determination on her mental health without any evidence of mental health concerns at the time of the hearing. While we acknowledge there was evidence presented that Mother attends counseling and that HCJFS was not concerned with her mental health at the time of the hearing, Mother's lack of a formal mental health diagnosis or serious mental health concerns at the time of the hearing does not mean the juvenile court could not consider the overall history of Mother's mental health. The record reveals that, in addition to testimony concerning Mother's erratic behavior toward the rehabilitation facility in October 2024, Aunt noticed that Mother began to act oddly around that time. Aunt testified that, in October or November 2024, she became concerned for the Children's safety while in Mother's care after Mother began responding to Aunt's messages in ways Aunt described as "off the wall," "hard to make out," and "hard to understand." At that time, Aunt believed Mother was "having a hard time" and dealing with some "health issues." The juvenile court was free to consider this evidence of Mother's irregular behavior and her prior threat of self-harm when determining whether she is a suitable parent. This behavior, as discussed above, prompted HCJFS' involvement with the family, called into question the Children's safety, and resulted in the Children's removal from Mother's care.

{¶ 22} Mother also takes issue with the juvenile court's consideration of the GAL's report when finding Mother an unsuitable parent. According to Mother, the juvenile court appointed the GAL solely for a best interest investigation. Therefore, Mother contends the GAL's comments regarding the suitability of Mother as a parent, as well as her ability to care for the Children, are outside the scope of the GAL's investigation and should not be relied upon. However, as other courts have recognized, a juvenile court's consideration of the GAL report and the GAL's testimony is not limited to the GAL's opinion regarding the best interest of the Children. *See In re Medure*, 2002-Ohio-5035, ¶ 42 (7th Dist.). Instead, the juvenile court and this court can refer to the GAL's report for factual observations made by the GAL throughout her investigation. *Id*. In this case, the juvenile court specifically found the GAL's report and testimony "outline[d] facts which also establish by a preponderance of the evidence that both parents are unsuitable to care for these [C]hildren." Thus, the court did not, as Mother claims, inappropriately rely on the GAL's opinion regarding the suitability of Mother. Instead, the court considered the factual observations made by the GAL through her investigation in its analysis of Mother's suitability.

{¶ 23} The facts included in the GAL's testimony and report depict a concerning relationship between Mother and the Children. According to the GAL, the Children desire to have less contact with Mother, including in person visitation and telephone conversations, and that neither child wishes to visit or live with Mother. Aunt relayed to the GAL a particularly troubling conversation she had with Dana, during which Dana threatened to get a knife and kill herself or choke herself if she had to visit Mother. Dana stated she does not desire to speak with Mother every day, refuses to attend scheduled visits, and considers Aunt to be her mother. Prior to the current court order, Aunt attempted to facilitate additional visits with Mother, however, the Children would either

run out of Mother's home and leave with Aunt, or cling to Aunt until she assured the Children she would return for them. When summarizing the basis of her concerns with Mother, the GAL testified that

> [w]hen I have a young child tell me that they don't ever want to see their Mother and they don't want to talk to them on the phone, and when you ask why, they go on to say that they would kill themselves . . . that's a very, very, very big concern.

Based upon this evidence, it is apparent that placing custody of the children with Mother at this time would cause extreme stress for the Children and would be detrimental to their emotional well-being. *In re M.B.*, 2012-Ohio-687, ¶ 12 (9th Dist.) ("Detriment to a child includes not only the physical and mental effects a custody award may have on a child, but also the emotional and psychological effects as well.").

{¶ 24} Although obvious transitional issues of moving from one home to another (i.e., change of home, school, community, friends) are not the type of detriment contemplated by *Perales* that would make a parent unsuitable, a court can consider evidence that a child is doing well and has integrated into her new community. *In re J.M.*, 2009-Ohio-4824 at ¶ 27; *In re C.V.M.*, 2012-Ohio-5514, ¶ 13 (8th Dist.). In this case, the Children have primarily lived with Aunt since the fall of 2023. Since that time, Mother's relationship with the Children has deteriorated. Mother has not provided for the Children's medical, social, monetary, or educational needs, and has been largely uninvolved in their daily lives. Aunt, on the other hand, is responsible for enrolling the Children in school, transporting the Children to their doctor's appointments, maintaining their primary health insurance, purchasing their clothing and essentials, and handling all other needs for the Children. Notably, for much of this time, Mother facilitated the Children's integration into Aunt's life, as the Children were not formally placed with Aunt until January 2025, nearly one and one-half years after the Children began school in Clinton County and had been

living, for most of the time, with Aunt. During that time, Mother seemingly acquiesced to Aunt's role as the primary caretaker for the Children.

{¶ 25} The fact that the Children have flourished with Aunt, and have found a stable, supportive, and loving home with her demonstrates that removing them from the home and security they have built would be harmful and detrimental to their overall welfare. *In re J.M.*, 2009-Ohio-4824 at ¶ 27. This is especially true considering the newly discovered issues with Mother's housing situation, as well as the caseworker's testimony that HCJFS would not return the Children to Mother due to "significant concerns about the [C]hildren's safety." The caseworker elaborated that, if Aunt's motion was denied, the agency would either file for custody of the Children or continue the safety plan with Aunt. Such evidence reflects that an award of custody to Mother would detrimentally impact the Children's well-being at this time.

{¶ 26} Accordingly, having thoroughly reviewed the record before us, we find the juvenile court did not abuse its discretion when it granted Aunt's motion for legal custody of Dana and Mary. In so doing, we emphasize that the juvenile court, as the finder of fact, possesses sound discretion of the allocation of parental rights and responsibilities, and that we must grant the juvenile court wide latitude in its consideration of the evidence. *See Miller*, 37 Ohio St.3d at 74; *Davis*, 77 Ohio St.3d at 418. In this case, the court reasonably concluded that the preponderance of the evidence supports that an award of custody to Mother would be detrimental to the Children's well-being and that Mother is unsuitable to be the legal custodian of the Children at this time.

{¶ 27} Mother's remaining arguments on appeal pertain to the juvenile court's second finding that she is unsuitable because she is incapable of caring for her children. However, we conclude we need not reach this issue due to our analysis above. As previously discussed, prior to awarding legal custody to Aunt, the juvenile court was

required to determine that Mother's conduct constitutes one of the four circumstances described by the Ohio Supreme Court in *Perales*. Importantly, the Ohio Supreme Court made clear that "[i]f a court concludes that *any one of*" the circumstances defined by *Perales* "describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." (Emphasis added). *Hockstok*, 2002-Ohio-7208, at ¶ 17. As discussed above, the juvenile court did not err by finding Mother unsuitable pursuant to the fourth circumstance defined by *Perales*, i.e., that placing the children in her custody would be detrimental to their well-being. Given this conclusion, we need not determine if the juvenile court erred in finding Mother unsuitable pursuant to an additional circumstance identified by *Perales*, as any one circumstance was sufficient to adjudge Mother unsuitable. *Id*.

{¶ 28} Accordingly, Mother's assignment of error is overruled.

{¶ 29} Judgment affirmed.

M. POWELL and SIEBERT, JJ., concur.

## J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge